J-S28022-16

2016 PA Super 176

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RICHARD BROWN | |
| Appellant | No. 2923 EDA 2014 |

Appeal from the PCRA Order October 3, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0808071-2004

BEFORE: BOWES, J., LAZARUS, J., and PLATT, J.[*]

OPINION BY LAZARUS, J.: **FILED AUGUST 12, 2016**

Richard Brown appeals from the order, entered in the Court of Common Pleas of Philadelphia County, denying his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.[1] Because trial counsel failed to have even one face-to-face meeting with Brown prior to his capital trial, we are constrained to deem such conduct constitutionally[2]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The standard of review of an order denying a PCRA petition is whether that determination is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. **Commonwealth v. Johnston**, 42 A.3d 1120, 1126 (Pa. Super. 2012).

[2] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." Moreover, Article I, Section 9 of the
*(Footnote Continued Next Page)*

ineffective representation pursuant to **Commonwealth v. Brooks**, 839 A.2d

245 (Pa. 2003), as it relates to the facts of this case. Thus, we reverse and

remand for a new trial.

The trial court set forth the relevant facts of the case as follows:

Brian Prout (also identified on this record as AZ), Christopher Smith (Smith is also identified as Jug-Head), and Vincent Smithwick (hereinafter Smithwick or also identified as Scooter) were paid enforcers who killed for profit at the command of Richard Brown (also referred to as Brown, or identified as Manny-Boo). In a conversation with Smithwick on February 7, 2003, Brown discussed his plan to kill Anthony Harris (Harris, or the decedent), and Richard Powell (Harris's [sic] best friend; hereinafter Powell). Brown specifically told Smithwick, 'we goin' to grab Harris.' After finalizing the plan, Brown[,] Smithwick, Prout, and Smith got into Brown's car to set out to find Harris.

Brown arrived at the home of Tonya Brister and Frank Tompkins at 3911 Fairmount Avenue in the City and County of Philadelphia. He arrived at the house unannounced dressed in all black and wearing black gloves. Brown talked with Tiesha Brister, Tonya's sister while three (3) to four (4) other males waited outside. After a few minutes, Brown left the house and Tiesha quickly closed and locked the door behind him. Later, Powell was approached by Brown on the street who told him, "I need you to take a ride with me." Powell stated he couldn't because he had to pick up his wife. Powell also spoke with Smith, who at the time was wearing a bulletproof vest. Powell later saw Harris and asked him if he had plans for the night. Harris said he was going to Little Frank's house [to] smoke

*(Footnote Continued)* _____

Pennsylvania Constitution provides in relevant part that "[i]n all criminal prosecutions the accused hath a right to be heard by himself and his counsel[.]" The Pennsylvania Supreme Court has held that with respect to the right to counsel, Article I, Section 9 provides the same level of protection to criminal defendants as does the Sixth Amendment. **See Commonwealth v. Pierce**, 527 A.2d 973 (Pa. 1987).

- 2 -

weed. Powell warned Harris to be careful. When Harris arrived at Tonya's he was informed that Brown had been by the house earlier asking questions. Frank Tompkins (Tonya's boyfriend); Ronnie-Ron (Harris' cousin), Tonya, Tiesha, and Harris went upstairs to a second floor bedroom to smoke marijuana and watch television. A few moments later, someone knocked on the front door downstairs. One of the younger children in the house yelled up to Harris to come to the door. After speaking with the visitor, he returned upstairs. Someone knocked on the door a second time, again asking for Harris, this time he remained downstairs for about fifteen (15) minutes. Harris returned to the bedroom and began pacing by the window. Harris turned to the others in the bedroom and said, "I'll be back, don't smoke my weed." Harris threw his hat on the bed and said, "If my girl calls, tell her you got my phone, I went to the store." At approximately 9:30 pm, Harris left his coat, cell phone, hat, and walked out the front door.

A short while later, Smith drove Harris to see Brown. Before Harris could exit the car, Prout tapped his AK-47 on Harris's [sic] window, and told him to get out. When Harris got out and attempted to run, Prout shot him. Harris, still conscious, was lifted into the back seat of a red Taurus wagon driven by Smithwick. Hyneith Jacobs (identified on this record as Neef-Buck or Jacobs) was across the street at the time and saw Prout shoot Harris. Brown saw Jacobs and threatened him to ensure that he did not [] talk to the police. Not willing to take any chances on disclosure, Brown forced him to ride along and participate in disposing of Harris's [sic] body.

Smithwick drove the wagon with Smith and Prout, while Harris sat bleeding in the back seat. Smickwick [sic] followed Brown who was driving a gold Impala sedan. While in the back seat, Harris was asked by Smith and Prout if he attempted to have Brown killed, which he denied. Prout and Smith removed Harris' jewelry, watch, and $1,000 cash from him. The men drove to an agreed upon location down by the Schuylkill river. Brown told Smithwick, "put [Harris] to sleep." Brown handed Smithwick a pair of black athletic gloves, and Smithwick shot Harris once in the forehead with a .357 handgun. Anthony Petty (identified on this record as Stutter-Ant) who had been in the car with Brown, began tying Harris' body with rope and bricks along with Prout. Smith[,] Prout, and Jacobs drug [sic] Harris through the snow to the river's edge, then dumped his body into the river. The men

got into the cars and drove to 76th and Elmwood Streets in the City and County of Philadelphia. Once there [PettyL] Prout, and Smithwick met BrownL] Jacobs, Jawayne Brown/ Maurice Brown and Fat-Mark to eat and hang out.

Jack Darrah, a CSX employee and eyewitness, saw two vehicles/ a station wagon and a sedan, parked off Wharton and Schuylkill Avenue in the City and County of Philadelphia after midnight. He saw four (4) males dragging a body towards the river's edge. Police then received a radio call for "males dumping a body into the river." Police arrived at a salt factory located at 1500 37th Street in the City and County of Philadelphia. Drag marks were discovered in the snow leading to the river's edge. A trail of fresh blood led down to the river's edge. Numerous footprints were found surrounding the path of blood. As police approached the bank of the river they discovered a body floating upside down in the water. The police Marine Unit was summoned and retrieved Harris's [sic] body from the water. The police recovered one (1) .357 fired cartridge at the scene, as well as one Timberland boot, and multiple layers of crinkled duct tape formed into large circles approximately one (1) foot wide. A Motorola pager was also recovered but its owner could not be determined due to the excessive wear, scratch marks/and blood on its face. The next day all of Anthony Harris' jewelry and watch were sold by Smithwick and Smith on the street and they shared in the profit. Vincent Smithwick was arrested on March 25, 2003. Christopher Smith was stopped by police on April 13, 2003 at 6th and Spring Garden Streets, and a black semi-automatic handgun was confiscated from his possession. Richard Brown and Brian Prout were arrested on May 19, 2003, at the Lincoln Greene Apartments. Two (2) handguns, a full magazine clip for a .45 handgun, and two (2) bulletproof *vests* were recovered from that location. Ballistics evidence collected at the location where Anthony Harris was killed, as well as recovered from Harris's [sic] body, matched the guns that were recovered from the apartment.

Trial Court Opinion, 7/19/07 at 1-6. (footnotes omitted).

In April 2004, June 2004, and December 2004, the court sent Nino

Tinari, Esquire, notices indicating that he had been appointed to represent

- 4 -

Brown and attached for trial in Brown's case as his court-appointed attorney.

Four months prior to trial, Brown privately retained new counsel, Jack McMahon, Esquire. Attorney McMahon, however, was unable to proceed to trial on the trial date due to "issues that he c[ould not] control."[3] As a result, the court ordered Tinari to represent Brown at trial.[4] In July 2005, Brown[5] was tried by a jury before the Honorable Renee Cardwell Hughes. After the jury returned its verdict,[6] Brown was sentenced to life imprisonment.[7] Brown filed a timely direct appeal. Our Court affirmed his judgment of sentence. *See Commonwealth v. Brown*, 974 A.2d 1177 (Pa. Super. 2009) (unpublished memorandum). The Supreme Court

_____

[3] N.T. Pretrial Discussions, 6/28/05, at 9. In fact, his sister had just died and he needed to take care of the out-of-town funeral arrangements.

[4] *Voir dire* began on June 30, 2005.

[5] Brown, Prout and Smith were tried jointly as co-defendants. Judge Hughes retired from the bench on June 3, 2011.

[6] Brown was also convicted of robbery, kidnapping, criminal conspiracy and carrying a firearm without a license. He was sentenced on those charges, respectively, as follows: 10-20 years' imprisonment; 10-20 years' imprisonment; 10-20 years' imprisonment; and 3½-7 years' imprisonment. The conspiracy sentence was ordered to run consecutively to his murder sentence, and the remaining sentences ran concurrently with his murder sentence.

[7] Brown was not represented by Attorney Tinari at sentencing. Rather, Attorney McMahon represented him at the penalty phase where the jury did not find aggravating circumstances to support imposition of the death penalty.

subsequently denied Brown's petition for allowance of appeal on October 1, 2009. *Commonwealth v. Brown*, 980 A.2d 604 (Pa. 2009).

On March 19, 2010, Brown timely filed the instant *pro se* PCRA petition. The PCRA court appointed Teri B. Himebaugh, Esquire[8] who later filed an amended petition. On July 22, 2013, the Honorable M. Teresa Sarmina held an evidentiary hearing on Brown's PCRA petition, limited to the following issues: (1) whether trial counsel was ineffective for failing to obtain exculpatory information disclosed by Commonwealth witness Vincent Smithwick to federal authorities during proffer sessions, and (2) whether trial counsel was ineffective for failing to meet with the petitioner prior to trial. Trial counsel, the trial prosecutor, and Brown testified at the hearing.

On July 29, 2013, Brown filed a motion for PCRA discovery, within which he requested his prison visitation logs. However, before the motion was ruled upon, counsel requested and the court granted PCRA counsel leave to withdraw. Newly-retained counsel, Paul George, Esquire, entered his appearance and filed a motion to reopen the record to present Brown's prison visitation logs. The court granted Brown's motion and, at an additional hearing on November 25, 2013, received the evidence from the recovered logs. On January 13, 2014, the PCRA court issued its Pa.R.Crim.P. 907 notice of intent to dismiss Brown's petition. In response,

_____

[8] On June 19, 2012, Himebaugh filed a motion for leave to amend Brown's PCRA petition, which she later filed on October 26, 2012.

Brown requested permission to amend his PCRA petition to include two additional claims of trial counsel's ineffectiveness and, again, asked the court to open the record. On March 7, 2014, the court heard oral argument on whether counsel was ineffective for failing to call character witnesses. On June 20, 2014, the PCRA court held an evidentiary hearing at which Brown presented character witness testimony that he would have presented at trial had he been given the opportunity.[9] The Commonwealth presented rebuttal testimony at that hearing as well. On October 2, 2014, in open court, the PCRA court dismissed Brown's petition, finding that he did not meet his burden to prove the ineffectiveness claims.[10] This timely appeal follows.

On appeal, Brown presents the following issues for our review:

_____

[9] Although the court did not formally grant Brown leave to amend his petition to include these additional ineffectiveness claims, Brown did file a consolidated petition to reopen the record to amend his petition as well as an amended petition raising these claims. *Cf. Commonwealth v. Elliott*, 80 A.3d 415 (Pa. 2013) (additional PCRA claims waived on appeal where petitioner failed to raise new claims in original PCRA petition or counsel's amended petition; interjecting claims in supplemental brief not sufficient to amend petition to include claims). Moreover, the fact that the court held a Rule 908 evidentiary hearing specifically on those claims allows us to infer that it implicitly granted Brown the right to raise the claims. Therefore, we find them properly preserved. *See* Pa.R.Crim.P. 905.

[10] *See Strickland v. Washington*, 466 U.S. 668 (1984) (setting forth three-prong test for ineffectiveness claims); *see also Commonwealth v. Spotz*, 47 A.3d 63, 76 (Pa. 2012) (to prevail on ineffectiveness claim, petitioner must plead and prove, by preponderance of evidence that (1) underlying legal claim has arguable merit; (2) counsel had no reasonable basis for action or inaction; and (3) petitioner suffered prejudice because of counsel's action or inaction).

(1)  Did the PCRA court erroneously deny [Brown's] petition where court-appointed counsel never visited or consulted with [Brown] before or during his capital trial?

(2)  Did trial counsel provide ineffective assistance where, because of his failure to consult with his capitally charged client, counsel failed to investigate and present character testimony and failed to investigate and object to the Commonwealth's inadmissible negative character witnesses?

(3)  Should [Brown] be awarded a new trial based on after-discovered evidence, where key Commonwealth witness Hyneith Jacobs has admitted giving intentionally false testimony to deflect blame from himself?

(4)  Did the PCRA court erroneously deny an evidentiary hearing regarding the proposed testimony of Edith Bond, a witness who observed a key portion of the incident and whose testimony exculpated Richard Brown?

(5)  Did trial counsel provide ineffective assistance in litigating an oral, mid-trial, boilerplate motion to suppress physical evidence, and, to the extent that trial counsel preserved [Brown's] suppression claim, was direct appeal counsel ineffective for failing to litigate this issue on appeal?

(6)  Did trial counsel provide ineffective assistance where he failed to request a jury instruction regarding other crimes evidence and failed to object to the trial court's failure to give such an instruction?

(7)  Did trial counsel provide ineffective assistance where he failed to obtain critical discovery relating to the Commonwealth's star witness Vincent Smithwick?

Because we find this issue dispositive of the instant appeal, we first address Brown's claim that trial counsel was ineffective where he "never visited or consulted with [him] before or during his capital trial." Appellant's Brief at 36.

The seminal case on this issue was decided by our Supreme Court in 2003. In **Commonwealth v. Brooks**, **supra**, the defendant, who chose to proceed *pro se* during his murder trial, raised a claim of stand-by counsel's ineffectiveness for failing to meet with him at *any* point prior to trial. In his capital direct appeal, our Supreme Court reversed the defendant's first-degree murder conviction and verdict of death, stating:

> As this testimony makes clear, [counsel] never once met with [the defendant] in person before his trial on capital charges. In fact, [counsel] testified that he could only specifically recall one telephone conversation with [defendant], and that conversation lasted just twenty minutes to one-half hour. It should go without saying that no lawyer, no matter how talented and efficient, can possibly forge a meaningful relationship with his client and obtain adequate information to defend that client against first-degree murder charges in a single thirty-minute telephone conversation. Although a lawyer can always learn certain information from his client over the telephone, we simply would be discounting the gravity of a death penalty case were we to say that a lawyer representing a defendant in such a case has done his job effectively when he has spent only limited time on the telephone with his client. **Indeed, the very nature of a capital case, typically quite involved and always subjecting the defendant to the possibility of death, clearly necessitates at least one in-person meeting between a lawyer and his client before trial begins. Without such a meeting, there is little to no hope that the client will develop a fundamental base of communication with his attorney, such that the client will freely share important information and work comfortably with the lawyer in developing a defense plan. Moreover, only a face-to-face meeting allows an attorney to assess the client's demeanor, credibility, and the overall impression he might have on a jury.** This is of particular importance in cases in which the client may take the stand in his defense or at the penalty phase in an attempt to establish the existence of particular mitigating circumstances. As Appellant was deprived of the benefits of a face-to-face meeting here, it is clear that Appellant's ineffectiveness claim has arguable merit. ***See***

> *[Commonwealth v.] Douglas*, 737 A.2d [1188,] 1199 [Pa. 1999].

*Id.* at 249 (emphasis added).[11] *Brooks* essentially announced the minimum action required by counsel to provide what is deemed constitutionally effective representation in capital cases: *counsel must conduct at least one face-to-face meeting with his client*.

More recently, in *Commonwealth v. Johnson*, 51 A.3d 237 (Pa. Super. 2012) (en banc), the defendant, who was also convicted of first-degree murder and sentenced to life in prison, argued on collateral appeal that trial counsel was ineffective where he failed to have a face-to-face meeting with him until the eve of trial. The majority determined that where counsel had a last minute meeting with Johnson on the eve of trial, a face-

---

[11] In *Commonwealth v. Britt*, 83 A.3d 198 (Pa. Super. 2013), a three-judge panel of this Court affirmed a defendant's conviction for first-degree murder and his sentence of life imprisonment. In that case, the defendant contended on direct appeal that counsel was *per se* ineffective for failing to "establish a relationship with him, interview him, keep him informed, take prompt action to protect his rights, or investigate this matter." *Id.* at 201. The defendant, relying on *Brooks*, *supra*, argued that the trial court failed to protect his rights when it neglected to conduct any inquiry into trial counsel's readiness for trial. *Id.* at 202. However, ultimately we found that because Britt's claims were non-record based and because he had not waived PCRA review, he could not seek review of his ineffectiveness claims on direct appeal but must have them deferred to PCRA review. *Id.* at 204, citing *Commonwealth v. Holmes*, 79 A.3d 562 (Pa. 2013). Thus, we find that any discussion regarding *Brooks* is *dicta*, and, therefore, neither binding nor relevant to our resolution of the instant case. Moreover, we distinguish the facts in *Britt* where counsel "had met with Appellant well before trial," *id.* at 205, from the instant case where there is no evidence that Tinari *ever* met with Brown.

to-face meeting with the defendant at his preliminary hearing, and a phone consultation with his client, he was not *per se* ineffective. Essentially, the Court found that counsel's limited pretrial contact with his client was entirely distinguishable from the attorney in *Brooks* who "failed to meet with his client 'at all.'" *Id.* at 243.[12] While our Court acknowledged that additional pre-trial attorney-client contact "may have been advisable," it declined to read *Brooks* in a way that would prevent it from analyzing the substantive impact that counsel had on the defendant's trial strategy. *Id.* at 243-44.

Subsequently, our Supreme Court revisited the *Brooks* issue in *Commonwealth v. Elliott*, 80 A.3d 415 (Pa. 2013). In that case the Supreme Court was faced with determining whether capital trial counsel was ineffective for "completely fail[ing] to communicate with [the defendant] in preparation for trial." *Id.* at 425. The Court determined that Elliott would not be entitled to relief under *Brooks* because the defendant neither sought

---

[12] The concurrence in *Johnson*, authored by the Honorable David N. Wecht, which was also joined by the Honorable Mary Jane Bowes, astutely points out that not only must capital defense counsel meet face-to-face with his client at least once before trial, but that that consultation must be truly substantive. *Johnson*, 51 A.3d at 250, 252 (Wecht, J., concurring) ("*Brooks*['] core premise is that at least one in-person meeting is necessary effectively to represent a defendant facing a first-degree murder trial. The meeting is not optional [and] cannot be an afterthought or a token visit made only to comply with the bare minimum standard."). Here, where we have *no* evidence of even one face-to-face meeting between Brown and Attorney Tinari prior to trial, an analysis of counsel's contact is not dictated by the holding of *Brooks*.

permission to amend his later petition to include reference to **Brooks** and the precise issue of counsel's ineffectiveness, nor had **Brooks** been decided prior to **Elliott's** appeal. **Id.** at 431. However, in coming to its conclusion, the Court noted that:

> It is clear that a majority of this Court in **Brooks** expressly required that counsel representing a defendant in a capital murder trial conduct a substantive, face-to-face consultation with the defendant prior to trial, *and held that a failure to do so amounted to ineffectiveness of counsel warranting the grant of a new trial*.

**Id.** The Court also made an important distinction between the analysis of failure-to-consult ineffectiveness claims pre- and post-**Brooks**. Specifically, prior to **Brooks** our courts had declined to evaluate such ineffectiveness claims based solely upon the existence or duration of counsel's pretrial face-to-face consultation with the defendant. **Id.**

Instantly, at the PCRA hearing, both Brown and Attorney Tinari testified that Attorney Tinari was present for Brown's preliminary hearing and conducted pre-trial discovery on his behalf. However, Attorney Tinari had no specific recollection of ever having met with Brown face-to-face to talk to him about the substance of his case or ever having spoken with him over the phone prior to trial. N.T. PCRA Hearing, 7/22/13, at 21. Attorney Tinari testified that he recalled having reviewed all pre-trial discovery at some point and having visited the site of the shooting. **Id.** at 17. But, counsel could not say whether his actions were for the preliminary hearing or for the trial of Brown's capital case.

Brown testified at the hearing that he never met face-to-face with Attorney Tinari prior to trial.[13]   *Id.* at 56.   Brown acknowledged that Attorney Tinari was present for his preliminary hearing, but he stated that Attorney Tinari never spoke to him about the case before, during or after the preliminary hearing and that immediately following the Commonwealth's witness testimony, "[Attorney Tinari] asked to be excused from the Preliminary Hearing."  *Id.* at 57.  The next time Brown saw Attorney Tinari was at his trial.  *Id.*  Brown also testified that he tried to call Attorney Tinari several times prior to trial while he was incarcerated, but he never was able to speak with him.  *Id.* at 57-58.[14]

Significantly, on June 28, 2005,[15] prior to trial, the trial judge had an on-the-record conversation with Brown and the attorneys involved in the

---

[13] Brown admitted several prisoner visitors' logs dating from September 2004 to his trial in July 2005, none of which listed Tinari as a visitor and the Commonwealth did not offer any testimony to the contrary.

[14] Brown also testified that had Attorney Tinari met with him prior to trial he would have given Attorney Tinari the names of several eyewitnesses and alibi and character witnesses names.  Brown also would have asked Tinari to challenge the information provided by the confidential informant involved in the case, which led to the issuance of the search warrant for the apartment where they uncovered physical evidence linking the crime to Brown.  *Id.* at 59.  While Brown may have raised these potential areas to investigate, they also by no means replace an informed attorney's analysis of possible defenses and trial strategies.

[15] Brown has been unable to obtain notes from a June 27, 2005 conversation between Attorney McMahon and Judge Hughes.  He alleges that the conversation may never have been transcribed.

case regarding Brown's privately retained counsel, Attorney McMahon. The court noted that Attorney McMahon had "very legitimate reasons" for not being able to honor the scheduled trial date,[16] and because of those reasons

_____

[16] Although not raised in the current appeal, in his amended PCRA petition Brown argued that trial counsel was ineffective for failing to raise the claim that he was denied his right to counsel of choice. **See** Amended PCRA Petition, 10/26/12, at 51. Specifically, Brown averred that he paid Attorney McMahon $10,000 in April 2005 to retain his services for trial. The record contains a Pa.R.A.P. 1923 motion filed by Brown in which he recreates the discourse between Attorney McMahon and Judge Hughes during counsel's request for a continuance due to the death of his sister and his responsibility to arrange her out-of-town funeral. According to Brown, Judge Hughes denied counsel's continuance request, and informed counsel that if he entered his appearance he would be starting trial on that date. Pa.R.A.P. 1923 Motion, 10/26/12, at 2. While the court never entered a formal order denying Brown's Rule 1923 motion, it implicitly did so by omitting the issue from being included at his PCRA evidentiary hearing.

As we have already recognized, an accused has the constitutional right to counsel. **See supra** note 2. The right to choose his or her own counsel, however, must be weighed against, and may reasonably be restricted by, the state's interest in the swift and efficient administration of criminal justice. **Commonwealth v. Randolph**, 873 A.2d 1277, 1282 (Pa. 2005). Here, Brown privately retained Attorney McMahon to represent him at his capital trial. Brown did nothing to intentionally delay the start of trial. **Cf. Commonwealth v. Travillion**, 17 A.3d 1247 (Pa. 2011); **Commonwealth v. Lucarelli**, 971 A.2d 1173, 1178 (Pa. 2009); **Commonwealth v. Kelly**, 5 A.3d 370 (Pa. Super. 2010). Under the particular circumstances where retained counsel's sister had passed away and Brown had been developing a defense strategy with counsel in his capital case for months, we believe that the court abused its discretion in denying Attorney McMahon's first and only record request for a continuance to give him additional time to prepare for trial. This is especially so where the court failed to conduct any balancing test to determine whether "the swift administration of justice would be vitiated by granting [counsel's] continuance," **Commonwealth v. Prysock**, 972 A.2d 539, 544 (Pa. Super. 2009), or even inquire as to when counsel would be able to proceed to trial, and consider severing his case from that of his co-defendants. **See Commonwealth v. McAleer**, 748 A.2d 670, 674 (Pa. 2000) ("a myopic insistence upon expeditiousness in the face of a
*(Footnote Continued Next Page)*

he had never entered his appearance in the case. N.T. Pretrial Discussions, 6/28/05, at 5-6. During the discussion, Brown told the trial judge that Attorney Tinari had never come to see him the entire time prior to trial and that Attorney Tinari did not know his case. *Id.* at 8-9, 10. Despite his legitimate concerns involving a life-or-death matter, the court informed Brown that "he had created this problem for himself" by having talked to Attorney McMahon months prior which "create[d] in Mr. Tinari's mind a situation to believe that you and Mr. McMahon might work this out, but you didn't." *Id.* at 9-10.[17] After assuring Brown that Attorney Tinari "kn[ew] his case" and was "one of the most successful attorneys in the Commonwealth," the trial judge told Brown "we're going to trial." *Id.* This is not a case of whether Attorney Tinari was competent to try this matter. But rather, where Brown had retained his own counsel and developed a rapport with same, forcing appointed counsel who had not met with Brown even once before

*(Footnote Continued)* _____

justifiable request for delay can render the right to defend with counsel an empty formality.") (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)); *see also Commonwealth v. Ross*, 57 A.3d 85 (Pa. Super. 2012) (where defendant faced first-degree murder charges for which Commonwealth sought death penalty, court manifestly abused its discretion in denying multiple motions for continuance in weeks prior to start of trial; trial court should pay careful attention to nature of crimes at issue and level of intricacy of evidence to be presented by parties when ruling on continuance motion).

[17] We find the trial court's reasoning faulty where there is no way that Attorney McMahon or Brown could have predicted that counsel's sister would pass away on the eve of trial, necessitating a continuance.

trial was an abuse of discretion and forced appointed counsel to be ineffective by court *fiat*.

As the court pointed out at the PCRA hearing, at the close of the Commonwealth's case the trial judge asked Brown whether he was going to present evidence in the matter, to which Brown replied that he would not testify. N.T. Trial (Jury), 7/19/05, at 67-68. Brown stated that while he had consulted with counsel regarding whether he should take the stand, it was his decision not to testify. *Id.* at 68 ("Is it your decision and yours alone after seeking [counsel's] advice?" "My decision."). Moreover, when the court asked Brown if he was satisfied with Attorney Tinari's representation, Brown responded, "I['ll] tell you after closing arguments." *Id.* at 69. In response, the trial judge told Brown that he had to tell her now. Brown responded, "Yes." *Id.*

While it could be argued that Brown's admission of adequate representation near the end of trial waives his claim on appeal, we do not find that Brown's answer defeats his ineffectiveness claim. As Brown acknowledged at the PCRA hearing, he felt as though when he was asked the question, the trial judge was "kind of putting him in a situation also, so – yes, I just answered. I just said yes." N.T. PCRA Hearing, 7/22/13, at 85. Moreover, Brown's impression that he felt coerced to answer "yes" to the question is further supported by the court's actions at the June 28, 2005 pretrial proceeding where the court gave him no option but to proceed with

Attorney Tinari as his trial counsel without fully considering his claim that he had never met with counsel prior to trial.

Finally, despite the trial judge's opinion that Attorney Tinari was "one of the most successful attorneys in the Commonwealth," N.T. Pretrial Discussions, 6/28/05, at 9, in *Brooks* our Supreme Court held that "no lawyer, no matter how talented and efficient, can possibly forge a meaningful relationship with his client and obtain adequate information to defend that client against first-degree murder charges in a single thirty-minute telephone conversation." *Brooks*, *supra* at 249. Here, Brown and Attorney Tinari did not even have the limited thirty-minute phone conversation which was afforded the defendant in *Brooks*. In fact, to the contrary, the record contains no evidence that they had *any* consultation or conversation about the case prior to the start of trial or had ever met before in an unrelated case or matter other than during the preliminary hearing in the instant case. *Cf. Elliott*, *supra* (distinguishing facts of *Brooks* where defendant had met with counsel in four, unrelated criminal cases and was familiar with and had working relationship with him).

Under such circumstances, it is clear that Brown's ineffectiveness claim has arguable merit. *Brooks*, *supra* at 249. Counsel offered no explanation, let alone a reasonable one, as to why he failed to meet with

Brown prior to trial or return any of his phone calls.[18] *Id.* at 250. Moreover, even if Attorney Tinari competently represented Brown at trial, one's constitutional right to the assistance of counsel also includes meeting with a defendant prior to trial because "in order to prepare a defense to a charge of murder in the first degree, it is essential that at the very least, counsel meet with his client in person to, *inter alia*, gather information from the client, evaluate the client's demeanor, and try to establish a working relationship."[19] *Id.* Under such circumstances, Brown was prejudiced by counsel's failure to meet with him in person prior to trial. *Id.*

Finally, the trial court and the Commonwealth assert that because Brown suffered no prejudice due to the overwhelming evidence of guilt presented at trial, he is not entitled to relief under the *Strickland*

---

[18] The obvious inference from the record is that once Attorney McMahon was retained, counsel did not believe that he had any further responsibility. However, there is no valid reason why Attorney Tinari had not met with his client even once in the eleven months before Brown hired Attorney McMahon.

[19] The Commonwealth claims that because Brown did not receive the death penalty, like the defendant in *Brooks*, he was not prejudiced. Appellee's Brief, at 18. However, *Brooks* does not limit its holding to whether a first-degree murder defendant ultimately receives a sentence of life imprisonment or the death penalty. Rather, the Court states that "the very *nature of a capital case*, typically quite involved and always subjecting the defendant to the *possibility* of death, clearly necessitates at least one in-person meeting between a lawyer and a client before trial begins." *Brooks*, *supra* at 249; *Id.* at 250 ("In order to prepare a defense to a charge of *murder in the first degree*, it is essential that at the very least, counsel meet with his client in person[.]").

ineffectiveness test. However, we remind the trial court and the Commonwealth that while *Brooks* did cite to the three-pronged *Strickland* ineffectiveness test, the Court concluded that "an attorney who does not meet in person with his client *at all* prior to a capital trial *simply cannot be deemed sufficiently prepared to defend his client's life*." *Brooks*, *supra* at 250 n.7 (emphasis added). With this precept in mind, the *Brooks* Court presumed that the defendant was prejudiced because "a defense to the charge of murder in the first degree" was not able to be prepared where counsel had never met with his client prior to trial. *Id.* at 250. *See Elliott*, *supra* at 431 ("*Brooks* expressly required that counsel representing a defendant in a capital murder trial conduct a substantive, face-to-face consultation with the defendant prior to trial, *and held that a failure to do so amounted to ineffectiveness of counsel warranting the grant of a new trial*.").[20] Indeed, the failure to meet with Brown and not to be aware of potential character and fact witnesses belies the Commonwealth's and trial court's position.

Instantly, we cannot affirm the trial court's decision to proceed with a capital murder trial when counsel, albeit reputable and competent, never had any in-person consultation with his client to determine an adequate

---

[20] *See Elliott*, *supra* at 451 (Castille, J., concurring) ("[T]he *Brooks* majority had established a bright-line rule that failure to meet with a client face-to-face established ineffectiveness per se.").

defense, learn of any potential witnesses or develop any trial strategy. Accordingly, we find that Brown was denied effective assistance of counsel,[21] **Brooks**, **supra**, and reverse the order denying Brown PCRA relief and remand for a new trial. **Johnston**, **supra**.

Order reversed. Case remanded for a new trial. Jurisdiction relinquished.[22]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/12/2016

---

[21] The Commonwealth contends in its brief that Brown "admitted he had not been willing to cooperate with appointed counsel" when he failed to tell Attorney Tinari about a potential alibi on the eve of trial or did not discuss witnesses with him on the first day of trial. Appellee's Brief, at 15. However, we remind the Commonwealth that Brown is entitled to constitutionally-based effective representation and that the duty to consult is placed on counsel, not his client.

[22] Having reversed the PCRA court and remanded for a new trial, we need not reach the remaining issues raised on appeal.