**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 808 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated May |
| | : | 31, 2023, in the Court of Common |
| | : | Pleas of Philadelphia County, |
| v. | : | Criminal Division, at CP-51-CR- |
| | : | 0606781-2006 |
| | : | |
| DONTE L. THOMAS, | : | SUBMITTED: February 12, 2024 |
| | : | |
| Appellant | : | |

**OPINION**

JUSTICE DONOHUE                                                          **DECIDED: September 26, 2024**

In September 2007, Donte Thomas was convicted of the first-degree murder of Tyreese Gaymon ("Victim") and sentenced to death.[1] On direct appeal, this Court affirmed the judgment of sentence. *Commonwealth v. Thomas*, 54 A.3d 332 (Pa. 2012). In October 2013, Thomas filed a timely petition pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546, which he amended multiple times. Following four days of hearings that occurred over two and a half years, the PCRA court dismissed Thomas' petition. This appeal followed. *See* 42 Pa.C.S. § 9546(d) ("A final court order under this subchapter in a case in which the death penalty has been imposed shall be directly

---

[1] Thomas was also convicted of carrying a firearm on public streets, recklessly endangering another person and conspiracy. 18 Pa.C.S. §§ 6108, 2705, 903. No sentences were imposed in connection with these convictions.

appealable only to the Supreme Court pursuant to its rules."). After careful consideration of the claims raised by Thomas, we affirm the order of the PCRA court.

## Background

In 2004, Tyreek Gaymon, Victim's cousin, was shot and killed. Victim identified Kareem Glass as his cousin's killer to the police. On February 3, 2006, while Glass was incarcerated and awaiting trial for Tyreek's murder, Victim was shot and killed while standing on a street corner at approximately ten o'clock in the morning. The investigation led the police to multiple witnesses who were present at the shooting and identified Thomas as Victim's assailant. Thomas was arrested for the murder on April 19, 2006. At the time of his arrest, Thomas waived his *Miranda* rights and gave a statement to the police in which he admitted knowing Glass, who he stated goes by the nickname "Gus," and buying a cell phone for Glass and giving it to a female corrections officer to smuggle into the corrections facility for him. He also told the police that he had visited Glass multiple times in prison and that he visited Glass on January 31, 2006, three days before Victim's murder. Thomas also indicated that when he visited Glass on that day, Glass introduced him to a man who he knows by the name "Wanted," who was present during his visit with Glass. Thomas stated that at that time, Glass was worried about a witness that was set to testify against him but when he spoke with Glass after Victim's murder, Glass was more relaxed. Thomas denied that Glass asked him to shoot Victim. Thomas denied shooting Victim or knowing who did.

Among the evidence the Commonwealth produced at trial was the testimony of two of the identifying witnesses, Maurice Gaymon ("Maurice")[2] and Stanley Battle ("Battle"), both of whom are Victim's cousins. They testified that they were standing on

---

[2] Because multiple people involved in the history of this case share the last name Gaymon, to avoid confusion we refer to Maurice and Tyreek Gaymon by their first names.

the street corner with Victim at the time of his murder and that they watched Thomas walk towards them from the opposite side of the street before pulling out a gun and firing multiple shots. *Thomas*, 54 A.3d at 76. The Commonwealth also offered Thomas' statement to the police as recounted above and, relevant to this appeal, evidence that a cell phone recovered from Glass' prison cell made and received a total of 118 phone calls on the day of Victim's murder. N.T., 9/12/2007, at 121. Another witness, Samuel Taylor, testified that in April 2006, he was in prison with Thomas. N.T., 9/12/2007, at 155. Taylor testified that while talking in Thomas' cell one day, Thomas admitted that he murdered someone for a friend named Gus because the victim was going to testify against Gus in another case. *Id.* at 157-58. Thomas also asked Taylor to kill the cousin of one of the witnesses against him. To that end, he wrote his girlfriend's phone number on a scrap of paper, gave it to Taylor and told Taylor to call her when he was released so that she could tell him where to find the intended victim. *Id.* at 159.

Thomas' defense was that because of his disabilities, it was physically impossible for him to have committed the murder. Thomas' girlfriend, Tamika McMurren, testified that Thomas was shot in 2003 and 2005 and required multiple surgeries, the most recent being in November 2005, just three months before Victim's murder. N.T., 9/14/2007, at 16-17. She explained that a result of his injuries, Thomas walks with a cane and cannot run. She further testified that Thomas has lost most of the use of his right arm and right hand, preventing him from being able to form a grip or fire a gun. *Id.* at 17. McMurren explained that because of his injuries, Thomas, who used to work in construction, has been unemployed and receiving disability since his first shooting in 2003. *Id.* at 18. To rebut the Commonwealth's evidence, Thomas called Officer Joseph Smith, who responded to the scene of the crime. Officer Smith testified that as he made his way to the location, he stopped Maurice because he fit the description of possible witnesses to

the murder. *Id.* at 68. Officer Smith stated that when questioned, Maurice said that he had been at the scene of the shooting and heard between fifteen and twenty shots fired, but he did not see the shooter. *Id.* at 70, 72.

The jury deliberated for approximately two and a half hours before returning a guilty verdict. In the penalty phase, the jury found two aggravating circumstances (grave risk of death to another in addition to the victim and killing in retaliation against a witness for the prosecution) and one mitigating factor (any other evidence of mitigation concerning the character and record of the defendant and circumstances of the offense, i.e., the "catch all" mitigator).[3] The jury found that the aggravating circumstances outweighed the mitigating circumstances and it recommended a sentence of death, which the trial court imposed.

On direct appeal, this Court considered the sufficiency of the evidence supporting Thomas' first-degree murder conviction, as is the established practice of this Court, *see Commonwealth v. Smith*, 985 A.2d 886, 894 (Pa. 2009), and found that the evidence was indeed sufficient. *Thomas*, 54 A.3d at 335-37. We also reviewed Thomas' claims of prosecutorial misconduct in connection with two comments made by the Commonwealth in its closing argument during the guilt phase of the trial and trial court error for refusing to give a "consciousness of innocence" instruction to the jury. *Id.* at 337-44. Finding no merit to these challenges, the Court affirmed the judgment of sentence. *Id.* at 345.

As referenced above, Thomas filed the initial, timely PCRA petition in 2013. Between 2013 and June 2019, the PCRA court held four discovery hearings and Thomas amended his petition multiple times. When the PCRA hearings commenced in November

---

[3] 42 Pa.C.S. §§ 9711(d)(7),(d)(15),(e)(8).

2019, Petitioner had raised a total of sixteen issues.[4] Following a number of discovery hearings, the evidentiary hearings were held in November 2019, January 2020, and June 2022. Thomas testified on his own behalf and called a number of witnesses in support of his claims. Of relevance to this appeal, Thomas testified that Nino Tinari, Esq. ("Trial Counsel") failed to consult with him, claiming that he and Trial Counsel never spoke about the possibility of an alibi defense, what witnesses they would need, the potential for pre-trial motions or whether to have a bench or jury trial. McMurren and Tella Mercado ("Mercado") testified that they would have testified at trial that Thomas was asleep at home at the time of the murder.[5] A particular focus for Thomas at the hearings was the list of 118 phone calls made on the day of Victim's murder that, at trial, the Commonwealth represented was generated from a cell phone recovered from Glass' cell. Thomas' counsel questioned the attorney that prosecuted Thomas' case, ADA Michael Barry, extensively about the origin of this list of calls, seeking to undermine its evidentiary competency.

On May 31, 2023, following the submission of post-hearing briefs, the PCRA court dismissed Thomas' petition and issued a comprehensive opinion discussing its rationale for rejecting each issue raised. Thomas appealed.

### Issues Raised on Appeal

Thomas raises twelve issues before this Court. We are mindful that our standard of review requires us to consider whether the PCRA court's factual findings are supported by the record and free of legal error. *Commonwealth v. Rizor*, 304 A.3d 1034, 1050 (Pa. 2023). A PCRA court's credibility determinations, when supported by the record, are

---

[4] The Honorable John Poserina presided over Thomas' trial while the Honorable Linda Carpenter presided over the PCRA proceedings.

[5] Mercado, a friend of McMurren, was staying in the home McMurren and Thomas shared at the time of the murder.

binding on an appellate court but its legal conclusions are reviewed de novo. *Id.* at 1051. Our scope of review is limited to the PCRA court's findings and the evidence of record, which we view in the light most favorable to the prevailing party. *Id.*

To be entitled to relief, a PCRA petitioner must prove by a preponderance of the evidence that the conviction or sentence at issue was the result of one or more of the circumstances set forth in Section 9543(a)(2) of the PCRA and establish that the claim has not been previously litigated or waived. *Commonwealth v. Crispell*, 193 A.3d 919, 927-28 (Pa. 2018) (citing 42 Pa.C.S. §§ 9543(a)(2),(3), 9544(a),(b)). The claims delineated in Section 9543(a)(2) include allegations of ineffective assistance of counsel and the violation of constitutional rights that so undermined the truth-determining process as to preclude a reliable adjudication of guilt, *see* 42 Pa.C.S. § 9543(a)(2)(i),(ii), the two categories into which Thomas' claims fall.

**Ineffective Assistance of Counsel**

Counsel is presumed to be effective and it is a petitioner's burden to overcome this presumption by a preponderance of the evidence. *Commonwealth v. Hairston*, 249 A.3d 1046, 1061 (Pa. 2021). To succeed on a claim of ineffective assistance of counsel, a petitioner must establish three criteria: (1) that the underlying claim is of arguable merit; (2) that counsel had no reasonable basis for his or her action or inaction; and (3) that petitioner was prejudiced as a result of the complained-of action or inaction. *Rizor*, 304 A.3d at 1051. The failure to satisfy any one of these criteria is fatal to the claim. *Id.* To establish prejudice in the context of this standard, a petitioner must establish that there is a reasonable probability that the result of the proceeding would have been different but for the complained-of conduct. *Commonwealth v. Dowling*, 316 A.3d 32, 40 (Pa. 2024).

1.      Failure to Consult

Thomas first challenges the PCRA court's determination that Trial Counsel was not ineffective for failing to adequately consult with him prior to trial.  Thomas's Brief at 28.  He argues that effective representation in a capital case requires personal contact between counsel and the defendant which must consist of at least one, in-person pre-trial meeting.  *Id.* at 29 (citing *Commonwealth v. Brooks*, 839 A.2d 245 (Pa. 2003)).  According to Thomas, his interactions with Trial Counsel were limited to a face-to-face meeting prior to his preliminary hearing and a brief phone call the week before his trial commenced.  *Id.* at 30-31.  Neither instance, according to Thomas, involved any substantive discussion of the case.  Thomas asserts that Trial Counsel's failure to consult with him deprived him of the opportunity to pursue the possibility of an alibi defense.  Thomas directs our attention to another capital case in which Trial Counsel was found ineffective for failing to meet with the client and urges this Court to reach the same conclusion here.  *Id.* at 32-33 (discussing *Commonwealth v. Brown*, CP-51-CR-0808071-2004).

The Commonwealth perceives Thomas' argument as an attempt to establish a finding of ineffectiveness per se for failure to meet with a defendant in prison.  It challenges Thomas' reliance on *Brooks*, explaining that not only did *Brooks* not create a per se rule, but that it is distinguishable from Thomas' case.  Commonwealth's Brief at 42-44.  The Commonwealth addresses the Superior Court's *Brown* decision that found Trial Counsel's conduct ineffective, explaining how it, too, is distinguishable.  *Id.* at 44-45.

Addressing this claim, the PCRA court was mindful of this Court's pronouncement that the adequacy of trial counsel's preparation is not measured by the number of minutes spent consulting with the defendant and that "[t]he shortness of time which counsel spends … with his client does not alone establish ineffective assistance[.]"  PCRA Court Opinion, 5/31/2023, at 7 (citing *Commonwealth v. Mason*, 741 A.2d 708, 715 (Pa. 1999)).

The court found evidence belying Thomas' claims that Trial Counsel failed to consult with him, pointing to Trial Counsel's testimony that he met with Thomas more than once and that he had regular communication with McMurren, who would relay information from Thomas and provide Trial Counsel with pertinent material. *Id.* The PCRA court found no merit to the contention that Trial Counsel was unprepared based upon his performance as reflected in trial transcripts, particularly his "extensive cross-examination of Commonwealth witnesses via exhibits and prior statements" as well as his presentation of witnesses for the defense. *Id.* at 7-8. Moreover, the PCRA court pointed to Thomas' colloquy during trial, during which he affirmed that he was satisfied with Trial Counsel's performance. *Id.* at 8-9 (quoting N.T., 9/17/2007, at 8-11).

The record supports the PCRA court's findings. At the PCRA hearing, Trial Counsel testified that he had no specific recollection of when he met with Thomas for the first time, N.T., 11/12/2019, at 27, but that he met with him prior to the preliminary hearing for approximately twenty minutes and discussed what would occur in that proceeding. N.T., 11/13/2019, at 77-78. He further testified that following the preliminary hearing, he met with Thomas in person "over four or five times" and also spoke with him on the phone. *Id.* at 78-79. During their conversations, Trial Counsel would update Thomas on the status of the case, discuss the discovery that was passed from the Commonwealth and their defense strategy, including the nature of his injuries and the witnesses they would call on his behalf. *Id.* Trial Counsel explained McMurren was a "faithful" liaison between he and Thomas, as she came to his office at least ten times and spoke with him on the phone multiple times to discuss the case and transmit information that Thomas wanted trial counsel to have, including the identification of potential alibi witnesses. *Id.* at 79-80. As part of his trial preparation, trial counsel explored the possibility of an alibi defense, and to that end, Thomas, via McMurren, identified only one possible witness for that

purpose. *Id.* at 80. Trial Counsel met with that proposed witness, Ronald James, but did not find him credible. *Id.* at 80.[6]

In light of these facts, we find no error in the PCRA court's conclusion that Thomas has failed to establish his claim. Thomas relies on *Brooks*, in which the Court considered a similar claim; there, the first-degree murder defendant alleged that his trial counsel was ineffective for failing to meet with him prior to trial. *Brooks*, 839 A.2d at 248. The evidence supported that claim, as counsel admitted that he never once met with the defendant prior to trial and only recalled one telephone call that lasted approximately twenty minutes. *Id.*at 249. As we have explained before, "a majority of this Court in *Brooks* expressly required that counsel representing a defendant in a capital murder trial conduct a substantive, face-to-face consultation with the defendant prior to trial[] and held that a failure to do so amounted to ineffectiveness of counsel warranting the grant of a new trial." *Commonwealth v. Elliott*, 80 A.3d 415, 431 (Pa. 2013). Here, however, the facts as found by the PCRA court support the finding that Trial Counsel and Thomas had multiple substantive, face-to-face meetings prior to trial, as well as continuing contact through the course of the trial, both directly and through McMurren. Thus, to the extent that Thomas seeks to align his case with *Brooks*, his claim falls short.

We are also unpersuaded by Thomas' reliance on the Superior Court's *Brown* decision, in which Trial Counsel was found ineffective for failing to adequately consult with another defendant. The circumstances in the present case are far from those of *Brown* that led to the finding of ineffectiveness. Trial Counsel was appointed to represent Brown, but Brown subsequently retained private counsel. On the eve of trial, private

---

[6] Ronald James submitted an affidavit in support of Thomas' claim, discussed infra, that trial counsel was ineffective for failing to call him as an alibi witness. Trial Counsel testified that the version of events recounted in James' affidavit was "not even close" to what James told trial counsel when they met prior to trial. N.T., 11/13/2019, at 83.

counsel, who never formally entered his appearance, was required to travel out-of-town to make funeral arrangements for a family member. The trial court ordered Trial Counsel to represent Brown at trial. *Brown*, 145 A.3d 196, 200-01 (Pa. Super. 2016). Critically, at a pre-trial conference the parties discussed private counsel's inability to appear. Brown complained that Trial Counsel had never met with him and did not know the case. Nonetheless, the trial court required Trial Counsel to represent Brown at trial.

Following his conviction of murder and the imposition of a life sentence, Brown raised, inter alia, a claim that Trial Counsel was ineffective for failing to consult with him prior to trial. *Id.* at 201. At a hearing on this claim, Brown testified that he never met with trial counsel prior to trial. *Id.* Brown explained that while Trial Counsel represented him at the preliminary hearing, Trial Counsel did not speak with him about the case before, during or after the preliminary hearing and immediately upon its conclusion, Trial Counsel asked to be excused. *Id.* Trial Counsel admitted that he could not remember speaking with Brown face to face or over the phone prior to trial. *Id.* at 204. While Trial Counsel could recall reviewing pre-trial discovery and visiting the scene of the crime, he did not know whether he took those actions in preparation for the preliminary hearing or the trial. *Id.* Although the PCRA court denied relief, the Superior Court reversed and awarded Brown a new trial. These facts, the Superior Court concluded, brought Brown's claim within *Brooks*' ambit and entitled him to relief. *Id.* at 206-07. The Superior Court interpreted *Brooks* as establishing a substantive, face-to-face meeting with a defendant as "the minimum action required by counsel" for a finding of constitutionally effective representation and determined that the facts of record supported the unavoidable conclusion that Brown was entitled to a new trial. *Id.* at 203.

The sheer contrast in the facts of *Brown* with the present case defeat Thomas' attempt to rely on its as the basis for relief. Unlike in *Brown*, Trial Counsel here met with

Thomas multiple times before trial and maintained contact with Thomas throughout the proceedings.

2.      Failure to Present Alibi Defense[7]

Thomas argues that Trial Counsel was ineffective for failing to investigate the possibility of an alibi defense, which he alleges could have been established by McMurren testifying that he was at home sleeping next to her in bed at the time of the murder. Thomas' Brief at 45-46.[8]  The PCRA court rejected this claim on the basis that McMurren "did testify at trial and did not provide alibi testimony as she could not account for her whereabouts at 10:00 a.m. on the day of the murder.  As such, any claim that her testimony would have been that Thomas was home with her and asleep on the morning of the murder remains unsupported."  PCRA Court Opinion, 5/31/2023, at 15 (citing N.T., 9/14/2007, at 60).

The PCRA court is correct in that during trial, when asked directly where she was at about 10:00 a.m. on the day of the murder, McMurren testified that she "couldn't even tell you."  N.T., 9/14/2007, at 60.  As she testified as to lack of memory as to her whereabouts at the time of the murder, she could not have provided an alibi for Thomas. Moreover, at the PCRA hearing, Trial Counsel testified that in his many conversations with McMurren prior to trial, "at no time did she ever mention anything about being there with [Thomas] at the time the incident occurred, and that's the reason there's no alibi."

---

[7]  An alibi defense "places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." *Commonwealth v. Roxberry*, 602 A.2d 826, 827 (Pa. 1992).

[8]  Portions of Thomas' argument suggest that he identified other potential alibi witnesses. Thomas' Brief at 49 ("Counsel could not have concluded that the alibi witnesses were not credible or that the defense was without merit in that he never even spoke to the witnesses or conducted any related investigation.").  Similarly, the PCRA court's opinion indicates that before it, Thomas identified Tella Mercado as another potential alibi witness.  PCRA Court Opinion, 5/31/2023, at 13.  However, the only potential alibi witness he discusses before this Court is McMurren.

N.T., 11/13/2019, at 24. Thus, the record supports not only the PCRA court's basis for denying this claim, but also refutes the notion that Trial Counsel did not consider the possibility of McMurren as an alibi witness before determining that she could not serve as one.

Thomas does not acknowledge McMurren's trial testimony or respond to the PCRA court's rationale for denying this claim, providing instead an alternative narrative that he claims McMurren would have testified to "had she been called." Thomas' Brief at 47. He relies on *Commonwealth v. Abney*, 350 A.2d 407 (Pa. 1976), to establish that counsel may be found ineffective for failure to investigate potential alibi witnesses. *Id.* at 49. Yet, the PCRA court's finding that Trial Counsel did discuss the possibility of an alibi defense, and even evaluated the one witness Thomas suggested could provide an alibi,[9] renders Thomas' reliance on *Abney* for this principle inapt.

Further, the circumstances in *Abney* that led to a finding of ineffectiveness are not present here. *Abney* does not involve a failure to investigate the possibility of an alibi defense. The victim in *Abney* was assaulted by a group of men while walking down the street. Minutes after the attack, a witness who was driving through the area with police identified the defendant as an assailant. *Abney*, 350 A.2d at 408. The Commonwealth's case at trial hinged on the testimony of the one eyewitness who identified the defendant. *Id.* at 409. In his defense, defendant testified that he was sitting on the steps in front of his home at the time of the attack, and he presented two witnesses who corroborated that account. *Id.* The defendant was ultimately convicted of second-degree murder and other crimes. In post-conviction proceedings, it was determined that trial counsel knew of at

---

[9] As referenced in connection with the prior claim of ineffective assistance of counsel, Trial Counsel testified that he interviewed Ronald James, who Thomas and McMurren provided as a potential alibi witness. N.T., 11/13/2019, at 80. Thomas does not mention Ronald James in connection with this claim.

least four potential witnesses whose testimony could exculpate the defendant, yet he did not call them. Two were eyewitnesses to the attack who said that the defendant was not one of the three assailants; the other two were men who confessed to committing the assault and told the police that the defendant was not a participant. *Id.* Trial counsel did not explain why he did not produce these witnesses. Noting that the Commonwealth's case rested on the testimony of one eyewitness and that no effort was made to produce any of the four witness that counsel knew could contradict the Commonwealth's case, we held, "[o]n this record[,] counsel's failure to present any or all of the other eyewitnesses cannot be said to have been reasonably designed to effectuate the client's interests." *Id.* at 409-10.

In marked contrast, McMurren could not provide the testimony that Thomas alleges would have undercut the Commonwealth's case, and Trial Counsel explained why he did not produce McMurren as an alibi witness. *Abney* is simply inapposite to the matter at hand.

3. Failure to Interview and Subpoena Witnesses

Thomas alleges that Trial Counsel was ineffective for failing to interview and subpoena Ronald James and Tella Mercado in support of Thomas' defense. Thomas' Brief at 52. He contends that James would have testified that he arrived at Thomas' house approximately ten minutes after the shooting and informed Thomas of the shooting. *Id.* at 54. In addition to corroborating James' testimony, Thomas asserts that Mercado would have testified that she was sleeping on Thomas' couch the night before the murder and was woken up when Wanted knocked on the front door, asking to see Thomas. *Id.* at 56. Thomas claims that Mercado would have testified, inter alia, that Wanted was acting nervous, had blood on his white shirt and was holding a gun in his hand, and that when she went to find Thomas, she found him asleep in his bedroom. *Id.* at 56-57.

Thomas complains that despite knowing about these witnesses, trial counsel did not have a private investigator interview them or subpoena them for the trial. *Id.* at 58. The failure to interview James and Mercado to determine whether they could provide beneficial testimony lacks any reasonable basis to advance Thomas' interest, he argues, and alleges that this failure rendered the verdict unreliable, thereby denying him a fair trial. *Id.* at 59-60.

In response, the Commonwealth argues that while the point of this testimony would be to establish an alibi defense, neither James' nor Mercado's testimony could do so but instead would have worked against his advantage by placing Thomas near the crime scene within minutes of the shooting. Commonwealth's Brief at 55.

When addressing this claim, first and foremost, the PCRA court found it foreclosed by Thomas' colloquy, during which he affirmed that he did not have any witnesses that he wished to call on his behalf and that there were no potential witnesses that were not contacted. PCRA Court Opinion, 5/31/2023, at 13 (quoting N.T., 9/17/2007, at 10). "Thomas cannot now decide, post-verdict, that these additional individuals should have been contacted and/or presented as witnesses at trial[,]" it concluded. *Id.*

Nevertheless, the PCRA Court offered alternative bases to find that the claim merits no relief. It noted that to prove ineffectiveness for failure to call a witness, a PCRA petitioner must prove that (1) the witness existed; (2) the witness was available; (3) counsel knew of, or should have known of, the witness; (4) the witness was willing to testify; and (5) the absence of testimony was so prejudicial as to deny the petitioner a fair trial. *Id.* at 12 (citing *Commonwealth v. Dennis*, 17 A.3d 297, 302 (Pa. 2011)). The PCRA court found that James' affidavit, which Thomas submitted in support of this claim, did not indicate that James was willing to testify. *Id.* at 14. It further noted the fault in James' proposed testimony identified by the Commonwealth – that it would have placed Thomas

in the vicinity of the murder within minutes of it occurring – and concluded that this provided a reasonable basis for trial counsel not to call James, even if he had been available and willing to testify. *Id.* Regarding Mercado, the PCRA court explained that it is undisputed that she did not come forward prior to trial out of fear for her safety and the safety of her family; that she was arrested in mid-February 2006, detained in Harrisburg, and did not return to the Philadelphia area until November 2006, which was after the conclusion of Thomas' trial; and that McMurren did not know how to get in contact with her until after she returned to Philadelphia in November 2006. *Id.* Thus, the court concluded, trial counsel cannot be found to be ineffective for failing to call a witness that was not known to him and that purposefully avoided participating in the case out of fear. *Id.*

Once again, Thomas overlooks the PCRA court's primary rationale for its ruling and dedicates his argument to establishing the underlying merits of the claims. It is established that "a defendant who makes a knowing, voluntary, and intelligent decision concerning trial strategy will not later be heard to complain that trial counsel was ineffective on the basis of that decision. … To do otherwise … would allow a defendant to build into his case a ready-made ineffectiveness claim to be raised in the event of an adverse verdict." *Commonwealth v. Brown*, 196 A.3d 130, 174 (Pa. 2018) (internal citation omitted). More to the point, in *Brown*, the defendant participated in a colloquy in which he expressly acknowledged that he was advised of all the witnesses his counsel intended to call in his defense and that there were no other witnesses that he wanted to have testify on his behalf. *Id.* We held that this voluntary averment precluded a claim of ineffectiveness based on counsel's failure to call other witnesses. *Id.*

The record reflects that the trial court colloquied Thomas just before the defense rested. In the colloquy, Thomas affirmed that he was satisfied with Trial Counsel's

representation; that there no additional witnesses that he wanted to call and no other potential witnesses that were never contacted prior to trial. N.T., 9/17/2007, at 9-10. Thus, the record supports the PCRA court's finding, and we find no error in its application of our law, which provides that a defendant who knowingly and voluntarily informs the trial court that there were no other witnesses that he wanted to call or to have contacted for the potential to be called waives any claim that his trial counsel was ineffective for failing to call or contact other witnesses.[10] *Brown*, 196 A.3d at 174.

4.    Failure to Adequately Prepare for Trial

Thomas argues that trial counsel was ineffective for failing to adequately prepare for trial in several discrete ways. As to each, however, Thomas fails to establish the criteria required for a viable ineffective assistance of counsel claim.

The first allegation surrounds Thomas' statements to the police. Thomas argues that although Trial Counsel was aware of a typed statement taken by the police, Trial Counsel was ineffective for not knowing about the existence of a handwritten statement taken by the police. Thomas' Brief at 61-62. Thomas does not describe the content of the written statement, nor does he allege that the written statement was different from the typed statement. Thomas does not explain how trial counsel's knowledge of it would have led to a favorable trial strategy or how this alleged ineffectiveness caused him to suffer prejudice.

The next allegation is that Trial Counsel was ineffective for failing to obtain a transcript of his preliminary hearing prior to trial. *Id.* at 62. While he states that Trial

---

[10] Thomas' claim regarding James is perplexing, considering that Trial Counsel testified that he interviewed Ronald James prior to trial and determined that he would not have provided an alibi. The record also supports the PCRA Court's determination that Thomas failed to prove that Mercado was available and willing to testify, or that the absence of her testimony was prejudicial to a point that it denied Thomas a fair trial. *See Commonwealth v. Dennis*, 17 A.3d 297, 302 (Pa. 2011).

Counsel needed this transcript "to develop a defense[,]" *id.* at 63, Thomas fails to allege how trial counsel's failure to obtain this transcript impacted the development his defense or how it caused him prejudice.[11] Thomas makes the same claim with regard to Trial Counsel's failure to obtain a transcript of Glass' preliminary hearing. *Id.* at 63-64.[12] Thomas explains that the transcript would have reflected that the Commonwealth nol prossed a solicitation charge against Glass related to Victim's murder. *Id.* at 64. While Thomas claims that Trial Counsel could have used this information from the transcript to argue that there was no evidence to connect Thomas to Victim's murder, Thomas makes no attempt to establish that there is a reasonable probability that this would have led to a different outcome at trial, and so he has failed to establish that the failure to obtain this transcript caused him prejudice.

Next is Thomas' claim that Trial Counsel rendered ineffective assistance when he failed to use the statement of Robin Rivera ("Rivera") that the police showed him two photo arrays during his police interviews, which would contradict the testifying detectives' testimony that the police used a single photo array when speaking with witnesses. Thomas contends that impeaching the detective's testimony in this way would have impacted their credibility in the eyes of the jury. *Id.* at 68-69. While we do not dispute

---

[11] The PCRA court explained that although Trial Counsel did not have a copy of the preliminary hearing testimony at trial, Trial Counsel, who represented Thomas at the preliminary hearing, informed the trial court that he had difficulty obtaining the transcript, read the Commonwealth's transcript during a break in the proceedings, and thereafter performed a vigorous cross-examination of the Commonwealth's witness. PCRA Court Opinion, 5/31/2023, at 10.

[12] Although Glass' trial for Tyreek's murder occurred after Thomas' convictions in this case, Thomas represents that Glass' preliminary hearing occurred before his trial. He supports this claim with citation to Glass' testimony at Thomas' PCRA hearing, in which Glass states that he could not recall when his preliminary hearing occurred before hazarding, "I want to say February '07, but I'm not exactly sure." Thomas' Brief at 63 (citing N.T., 1/12/2019, at 69).

that as a general matter, evidence impacting credibility determinations can be crucial, Thomas does not explain how the absence of this relatively minor point of impeachment caused him prejudice, especially when multiple witnesses identified him as the assailant. Moreover, as the Commonwealth points out, Rivera did not testify at trial nor did the Commonwealth rely in any way on Rivera's identification of Thomas, and the detective explained during questioning that the police showed the **testifying** witnesses a single photo array. Commonwealth's Brief at 62 (citing N.T., 9/10/2007, at 167-71; N.T. 9/11/2007, at 86-88). Accordingly, not only does Thomas fail to establish prejudice, but there also is a lack of factual foundation for this claim.

Thomas' fourth claim concerns Trial Counsel's handling of an expert witness for the defense, Dr. Saqib Rehman. Dr. Rehman performed surgery on Thomas' arm in October 2005, months before Victim's murder, and last examined Thomas on November 2, 2005. Although Thomas did not call Dr. Rehman to testify in his defense, the Commonwealth called him to rebut McMurren's testimony that Thomas is unable to use his right hand. Dr. Rehamn explained the nature of the surgery he performed on Thomas and testified that when he met with Thomas two days after surgery, on November 2, 2005, Thomas could open and close his right hand. Thomas' Brief at 71. Thomas hypothesizes that Trial Counsel read Dr. Rehman's report for the first time "sometime after opening argument" and at that point realized that the doctor's testimony would not help his client's defense. *Id.* at 71-72. Thomas complains that Trial Counsel was ineffective because he was "not prepared to counter the Commonwealth's direct examination, which the jury relied upon to find that [Thomas] was physically able to fire the gun" and for failing to ensure that the jury understood that Dr. Rehman's observations were limited to the day he saw Thomas. *Id.* at 71-72.

We again are constrained to find that Thomas has failed to adequately establish this claim. Presuming that there is arguable merit to this claim of ineffectiveness attendant to trial counsel's handing of Dr. Rehman, Thomas makes no effort to establish that it resulted in prejudice. Thomas makes the unsupported assertion that but for Trial Counsel bringing Dr. Rehman into the case, the Commonwealth would not have been able to refute Thomas' defense that he was physically unable to commit the crime. *Id.* at 76. This overstates the quality of Dr. Rehman's testimony. Dr. Rehman testified that he performed surgery on Thomas in late October 2005 for a severe fracture of his arm; that Thomas did not appear to have nerve damage; and that the last time he saw Thomas was two days post-surgery, at which time Thomas could open and close his right hand. N.T., 9/17/2007, at 21-22. None of Dr. Rehman's testimony suggested that he was opining as to Thomas' physical condition as of the date of the murder – a point that Trial Counsel emphasized in his cross-examination of the doctor. *See* N.T., 9/7/2007, at 27, 35, 39, 41. Second, the Commonwealth offered other evidence that refuted Thomas' defense, most notably the multiple eyewitnesses who testified that they observed Thomas shoot Victim, as well as a detective who testified that when interviewing Thomas following his arrest, Thomas used his right hand to hold cups of coffee and water and to strike matches to light cigarettes. N.T., 9/12/2007, at 119-20. Thomas ignores this evidence in his effort to make his claim, but we cannot. Thomas fails to establish how the absence of Dr. Rehman's testimony would have altered the outcome of the trial.

Thomas' next two allegations of ineffectiveness also fail. Thomas makes the bare assertion that trial counsel was ineffective for failing to ensure that a neighborhood survey,[13] referenced by a detective in his testimony and mentioned by Trial Counsel in

---

[13] According to the testifying detective, the neighborhood survey contained records of the people the police spoke to in the neighborhood during their investigation. N.T., 9/11/2007, at 22.

closing, was admitted into evidence because "**if** it included information helpful to the defense … it was incumbent on [trial counsel] to ensure that the survey itself be admitted into evidence." Thomas' Brief at 77-78 (emphasis added). Thomas' supposition that the survey might have held helpful evidence falls short of the standard demanded for a claim of ineffective assistance of counsel. As the Commonwealth points out, Thomas does not identify information in the survey that would have been beneficial to him or explain how its introduction would have led to a different verdict, which precludes finding that the underlying claim is of arguable merit and that prejudice was a result. *See Rizor*, 304 A.3d at 1051.[14]

Thomas makes a similarly unsupported claim regarding a CD containing recorded prison phone calls made by Glass. He argues that trial counsel was ineffective for failing to listen to this CD, choosing to "fly blind rather than to adequately prepare for this capital murder trial[.]" Thomas' Brief at 78. Yet, Thomas does not describe the content of the CD, explain how it would have been beneficial to his defense, or establish how this alleged ineffectiveness resulted in prejudice. Instead, he makes only the vague claim that the alternative of "being prepared [] offered a potential for success substantially greater than the course … pursued." *Id.* Without establishing how the failure to listen to the CD rendered Trial Counsel unprepared, we cannot follow Thomas' conclusion that Trial Counsel had no reasonable basis for his actions or that prejudice followed.

---

[14] Although we find that Thomas' claim fails because he has not developed an argument to support it, we note that the PCRA court rejected this claim on the basis that the survey **was** admitted into evidence. The record reflects that this was the case. N.T., 9/11/2007, at 22; N.T., 9/14/2007, at 4-5. Accordingly, Thomas' claim that Trial Counsel was ineffective for failing to ensure that the neighborhood surveys were admitted into evidence fails on the merits, as well.

5.    Failure to Object

Thomas argues that trial counsel was ineffective for failing to object to testimony that created two "unsubstantiated prejudicial inferences" that he was involved in making threats against witnesses to Tyreek's murder.  Thomas first directs our attention to the following exchange between the Commonwealth and Maurice:

> **Commonwealth**:   As a result [of witnessing Tyreek's murder], … had you been taking any precautions regarding people you don't know?
>
> **Maurice**:    Yes
>
> ***
>
> **Commonwealth**:   Were you … doing anything regarding looking out for people you didn't know as a result of the homicide that happened with Tyreek?
>
> **Maurice**:    Yes
>
> **Commonwealth**:    Did that factor at all into the fact that you were looking at [Thomas] walking down Thompson Street?
>
> **Maurice**:    Yes.

*Id.* at 115 (quoting N.T., 9/10/2007, at 143-44).  Thomas also points to this exchange:

> **Commonwealth**: Were you aware of any threats having been made to [Victim]?
>
> **Maurice**:    Yes.
>
> **Commonwealth**:    How did you become aware of that?
>
> **Maurice**:    [Victim] came to my house, him and my brother, one Sunday afternoon.

*Id.* (quoting N.T., 9/10/2007, at 165).  Thomas argues that from this testimony, inferences arose that he was involved in making threats against Victim, which were wholly unsupported by evidence and therefore objectionable as constitutionally infirm.  *Id.* at 115-16.  Thomas avers that there could have been no tactical reason for Trial Counsel not to object and that his failure to object "severely undermined any confidence this Court could

have in the outcome of the trial[,] thereby denying [Thomas] his constitutional right to due process and a fair trial." *Id.* at 117.

The Commonwealth disagrees that this testimony gave rise to inferences linking Thomas to threats made against Victim or anyone else. The Commonwealth responds that it was "abundantly clear during trial that [Thomas] was **not** involved with the earlier murder of Tyreek [] and that he had never interacted with [Victim] or the Gaymons." Commonwealth's Brief at 68. "In fact," it continues, "the Commonwealth's core theory was that [Thomas] had no connection with the victim or these drug groups, but instead met with Glass in prison and then murdered the key witness in Glass' case three days later. Thus, there was no legal support for [Trial Counsel] to object to evidence of prior bad acts with which [Thomas] clearly was not associated." *Id.* at 68-69.

The PCRA court disposed of this claim by finding that the testimony at issue fits an exception to the rule that generally prohibits the introduction of evidence of prior bad acts. PCRA Court Opinion, 5/31/2023, at 16-18. It reasoned that the evidence at issue, the inference of threats being made against witnesses to Tyreek's murder, was proper evidence of motive because "the circumstances grew out of the prior shooting of [Tyreek], to which [Victim] and Stanley Battle were eyewitnesses." *Id.* at 17. It bolstered its determination by concluding that the testimony was also admissible to prove absence of mistake. *Id.* at 17-18 (citing Pa.R.E. 404(b)(2)). The court reasoned that the probative value of establishing a sequence of events and the development of the case "far outweigh[ed]" any possible prejudice to Thomas, as Maurice never accused Thomas of engaging in threats or intimidation. *Id.* at 18.

We appreciate that the PCRA court provided a rules-based justification for its ruling, but we need not go that far to resolve this claim. We fail to see any inference implicating Thomas in the making of threats in the complained-of testimony. This is true

when it is read in isolation, as Thomas invites us to do, and more so when read in fuller context. The first excerpt of testimony follows Maurice's statement that he was on the street corner with Victim and others when he saw Thomas, who none of them knew, walking up the street toward them. N.T., 9/10/2007, at 139-41. Maurice testified that he continued to watch Thomas as he approached, pulled out a gun and began firing at them. *Id.* at 141-43. This first excerpt of testimony to which Thomas points was offered as an explanation for why Maurice continued to watch a stranger walk up the street. It does not mention threats made by anyone, much less Thomas or someone associated with Thomas. In fact, no mention of threats against Victim had been made at that point in Maurice's testimony. The same is true of the second fragment of testimony wherein Maurice states that he knew of threats made against Victim, as it in no way implicates Thomas as the source of threats. Thomas does not explain how this testimony, which does not mention him or any other person by name, implicated him such that an inference of his involvement would arise.[15] Because Thomas has failed to establish the foundation of this claim – the possibility of prejudicial inferences – he has failed to prove that it has arguable merit.

6.    Failure to Seek Cautionary Instruction

The next claim alleges that Trial Counsel was ineffective for failing to seek a cautionary instruction contemporaneously with Taylor's testimony that Thomas asked Taylor to kill the cousin of a witness against him. Thomas represents that Trial Counsel objected to Taylor's proposed testimony, which led to the Commonwealth agreeing that a cautionary instruction would be appropriate. Thomas' Brief at 119-20. However, no instruction was given at the time Taylor testified. The Commonwealth later referenced

---

[15] Moreover, the record reveals that Trial Counsel did object to this testimony regarding threats. *See* N.T., 9/10/2007, at 165.

Taylor's testimony in its closing, which drew an objection from Trial Counsel. The trial court sustained the objection but, Thomas claims, the Commonwealth ignored the ruling and immediately returned to Taylor's testimony in its remarks. *Id.* at 121. Thomas argues that Trial Counsel's failure to ensure that a cautionary instruction was given contemporaneously with Taylor's testimony, coupled with his failure to renew his objection to the Commonwealth's closing argument after the Commonwealth ignored the trial court's ruling, resulted in the jury receiving only one, deficient jury instruction that was "insufficient to cure the potential and irreparable prejudice caused by the admission" of Taylor's testimony. *Id.* at 122.

To begin, the record contradicts Thomas' version of events at trial. The parties raised the admissibility of this aspect of Taylor's testimony prior to Taylor taking the stand. The Commonwealth explained that there were two aspects of Taylor's testimony to consider: the substance of the testimony (that Thomas asked Taylor to kill a witness against him) and the fact that Taylor and Thomas were in prison when the conversation occurred. The Commonwealth agreed to a cautionary instruction only for this second aspect of Taylor's testimony. N.T., 9/10/2007 at 5 ("I have no problem, and if the [c]ourt wants to instruct or have me or [trial counsel] instruct, [Taylor's] only in custody as a result of the accusation on this case and that nobody gets bail on a homicide accusation … and you're not to infer anything from that."). As to the other aspect of the testimony, following robust argument, the trial court agreed with Trial Counsel that the testimony was "absolutely prejudicial" but found that the prejudice did not outweigh the probative value. N.T., 9/10/2007, at 8-9. Thus, the Commonwealth did not agree that the substance of Taylor's testimony warranted a cautionary instruction. To the extent that Thomas' claim is premised on the failure to enforce an agreement between the parties, it fails.

Further, the trial court gave a consciousness of guilt instruction specifically in connection with Taylor's testimony. PCRA Court Opinion, 5/31/2023, at 22 (quoting N.T., 9/18/2007, at 25-26). The charge was "crafted from the model language" of Pennsylvania Suggested Standard Criminal Jury Instruction 3.15, the Subcommittee Note to which, the PCRA court explains, provides that the instruction should be reserved for the final jury instruction. *Id.* Despite simply stating that the failure to give the instruction contemporaneously with Taylor's testimony rendered the instruction "insufficient to cure the potential irreparable prejudice" caused by Taylor's testimony, Thomas' Brief at 122, Thomas does not explain how a contemporaneous instruction would have cured the "potential irreparable prejudice" or cite authority to support his position that a contemporaneous instruction was needed or appropriate. Thomas does not respond to the PCRA court's observation that the instruction was modeled on the relevant Suggested Standard Criminal Jury Instruction. And despite his accusations that Trial Counsel was ineffective for failing to ensure that a contemporaneous instruction was given and for failing to renew his objection to the Commonwealth's closing argument, Thomas does not establish a reasonable probability that the outcome of the trial would have been different absent those failures.

7.      Failure to Request Jury Charge

Thomas' next allegation is rooted in Stanley and Maurice's admissions that immediately before Victim's murder they were smoking marijuana. Thomas challenges trial counsel's performance as ineffective for failing to seek a charge instructing the jury to weigh Stanley and Maurice's testimony "with greater care than the testimony of a witness who does not abuse drugs or alcohol." *Id.* at 125. He also contends that the jury should have been instructed to determine whether these witnesses' testimony was "affected by drug use or the need for drugs." *Id.* To establish the arguable merit of this

claim, Thomas relies on a 1982 case from the Tenth Circuit of Appeals for the proposition that an "addict instruction" is warranted when the prosecution relies on the testimony of an narcotics addict. *Id.* at 124 (quoting *United States v. Smith*, 692 F.2d 658, 661 (10th Cir. 1982)).

The PCRA court rejected this claim on the basis that the requested addict instruction is a creature of federal jurisprudence and not applicable to proceedings in the courts of our Commonwealth, which drove its conclusion that a request for such an instruction would have been unreasonable. PCRA Court Opinion, 5/31/2023, at 26.[16] There is no error in this ruling. Thomas does not provide authority to support the notion that this Commonwealth recognizes an addict instruction similar to what is found in federal law, and so we agree that Thomas has failed to prove that Trial Counsel's failure to request one lacked a reasonable basis. Moreover, there was no testimony that either Stanley or Maurice were addicted to narcotics.[17] Thus, even if such an instruction existed in our jurisprudence, Trial Counsel could not be ineffective for failing to seek a jury instruction that lacked an evidentiary foundation. Further, Thomas only levels the bald assertion that "[t]here was no tactical reason for [Trial Counsel's] failure to request" an

---

[16] The Commonwealth's argument on this point mirrors the PCRA court's explanation, in that it points out that federal circuit court law is not binding on the courts of this Commonwealth and that Pennsylvania jurisprudence contains no analogous instruction. Commonwealth's Brief at 75. It also points out that the trial court did instruct the jury on the various factors that should be considered when assessing credibility. *Id.*

[17] The extent of testimony regarding these witnesses' drug use is that Maurice admitted to smoking marijuana before the shooting occurred and on cross-examination. Maurice admitted that he has used marijuana "for a number of years." N.T., 9/10/2007, at 162, 182. We note that Trial Counsel emphasized marijuana use in a lengthy line of questioning aimed at challenging the credibility of Maurice's identification of Thomas. *See id.* at 177-83. With regard to Stanley, the testimony was limited to his admission that he smoked marijuana shortly before the shooting occurred. N.T., 9/11/2007, at 93.

addict charge; he makes no effort to establish how the absence of such an instruction resulted in prejudice. Thomas' Brief at 126. For this reason as well, the claim fails.

8.    Failure to Object to Statement Made in Closing

Thomas draws our attention to the following comments made by the Commonwealth in closing:

> What else do we know? We know his [sic] conspiring to break the law with Kareem Glass. He's in a cell in the prison. We know he's playing games with the prisons and **conspired to break other laws with him.**

*Id.* at 127 (quoting N.T., 9/17/2007, at 111) (emphasis supplied by Thomas). Thomas argues that these comments created the inference that he conspired to commit other uncharged acts with Glass, making reference to them prohibited by Pennsylvania Rule of Evidence 404(b). He explains that Trial Counsel did not object to these comments and argues that "allowing a jury to make their guilt determination in any way based upon uncharged bad acts cannot … be considered to be either tactical or in [Thomas'] best interests." *Id.* at 127-28. With regard to prejudice, Thomas claims that "[t]he prosecution's argument led the jury to incorrectly assume that there were other, unidentified crimes that [Thomas] and Glass conspired to commit[,]" and presumes that the jury relied on that assumption to conclude that "[i]f [Thomas] was guilty to those unidentified crimes he was more than likely also guilty of this crime as well[.]" *Id.* at 127.

The Commonwealth responds that Thomas is taking these comments out of context and that when properly viewed, it is apparent that the Commonwealth was referring to Thomas' admission that he helped smuggle a phone into prison for Glass. Thus, the Commonwealth contends, this was not a reference to an unidentified, uncharged act but a permissible reference to Thomas' own statement. Commonwealth's Brief at 69-70.

When addressing this claim, the PCRA court reproduced the paragraphs that proceeded and followed these comments, thereby orienting the statements at issue in a broader context. PCRA Court Opinion, 5/31/2023, at 18-19. Viewing them in this manner, the PCRA court found that it was clear that the Commonwealth was referring to the smuggling of the cell phone into prison for Glass. *Id.* at 20. Because these remarks were supported by evidence – specifically, the testimony of Detective Piree and Thomas' own statement to the police – the PCRA court found that they were proper, and therefore that there was no basis for Trial Counsel to raise an objection. *Id.* at 21-22.

There is no error in the PCRA court's determination. Closing remarks are evaluated in the context in which they were made. *Commonwealth v. Ligon*, 773 A.2d 1231, 1238 (Pa. 2001). We agree that when read in context, it is clear that the Commonwealth was referring to the agreement between Glass and Thomas to smuggle a cell phone into prison. At this point in his summation, ADA Barry was recapping the evidence. Immediately before the complained-of comments were made, ADA Barry was recounting the statements Thomas made to Detective Piree regarding his interactions with Glass:

> Kareem asked me to get him a cell phone. I got him a cell phone before. Gave it to a female guard on Girard Avenue, then when I did that, Kareem would call me and tell me he got the package, the telephone. … What else do we know? We know he was conspiring to break the law with Kareem Glass. He's in a cell in the prison. We know he's playing games with the prisons and conspired to break other laws with him.

N.T., 9/17/2007, at 111. The close temporal relation between the reference to smuggling a cell phone into prison and the characterization of the conduct as conspiring to break the law, with no intervening reference to any other conduct, leaves no room for the inference Thomas alleges. Thus, Thomas fails to establish that there is arguable merit to his underlying claim.

9.    Conduct During Penalty Phase of Proceedings

In his final challenge to Trial Counsel's performance, Thomas maintains that counsel inappropriately chastised and berated the jury for returning a swift verdict in the guilt phase of the trial. Thomas' Brief at 128. He points to the following comments:

> Good morning, once again, ladies and gentlemen. Of course, I come before you with trepidation, because you already made a determination and made it swiftly, quickly. You made it to the point that you didn't even have the time to deliberate, to talk about it, to think about it so I come before you with the thought, while I was walking into the courtroom, that you would go back into that jury room and just come running back again and say death.
>
> ***
>
> [D]on't […] jump to another conclusion as quickly as you did to come to the point that you must put him to death.
>
> ***
>
> [Y]ou are asking to be God-like under these circumstances and, of course, the law has given you that kind of power. It has also given you the power to review carefully what you're about to do here, to take the time to review each and every factor that has come into this courtroom … .

*Id.* at 128-29 (quoting N.T., 9/19/2007, at 60-61; 66-67). Thomas complains that through these statements, Trial Counsel "belittled and alienated the jury by accusing them of violating their sworn duty to deliberate." *Id.* at 129-30. Thomas argues that even if trial counsel had been trying to ensure that the jury would take its time when considering whether to sentence him to death, "there were better, less contemptuous way to express that to the jury[,]" *id.* at 129, yet he does not identify what those other, better ways would have been. He again presumes prejudice rather than establishing it, stating only that "[t]his had to have prejudicially impacted on the jury's penalty phase determination even if it was only subliminally. The jury would not have sentenced [Thomas] to death in this

case absent such conduct by counsel." *Id.* at 130. We cannot presume this to be the case. It was Thomas' burden to prove that Trial Counsel's comments caused the jury to render a death sentence, and he has not met this burden. We therefore conclude that Thomas has failed to meet the threshold requirements for a claim of ineffective assistance of counsel, precluding relief on this issue.

### Prosecutorial Misconduct

Thomas makes two overarching claims of prosecutorial misconduct. We first address his claim that ADA Barry induced the presentation of false testimony, thereby depriving him of a fair trial and entitling him to the attachment of double jeopardy as guaranteed by Article I, Section 10 of the Pennsylvania Constitution. Thomas' Brief at 90. Although Thomas' argument on this point is meandering and difficult to follow, we discern that the allegedly false evidence at issue is testimony elicited by ADA Barry from Detective Piree regarding the recovery of a cell phone from Glass' prison cell. *Id.* at 87-89. Thomas argues that the Commonwealth used records from a cell phone found in Glass' possession to establish a connection between Glass and Thomas, and inferentially, a connection between Thomas and the murder. *Id.* at 90.

The basis for Thomas' claim begins with Detective Jeffrey Piree's testimony at trial that when taking Thomas' statement subsequent to his arrest, Thomas admitted to buying a cell phone for Glass and giving it to a corrections officer to smuggle it into prison, and that Glass would call him from that cell phone. ADA Barry then proceeded with the following line of questioning, upon which Thomas bases this claim:

> **ADA Barry**: As a result of that information regarding the [Corrections Officer], did you refer to [sic] that information the prisons?
>
> **Detective Piree**: Absolutely. I got a date and all, April 20. I spoke with internal security at the prison.

**ADA Barry**: Did you at any point attempt to recover a cell phone from the cell of Mr. Kareem Glass as a result of that statement?

**Detective Piree**: The cell at police headquarters?

**ADA Barry**: No, a cell phone. Did you recover – was a cell phone recovered from the jail cell of Kareem Glass at the CFCF as a result of this statement?

**Detective Piree**: I don't believe so. If there was one recovered, I'm not aware of it.

N.T., 9/12/2007, at 120. ABA Barry then had Commonwealth's Exhibit 73 marked and shown to Detective Piree. The questioning resumed :

**ADA Barry**: Take a second to look at C-73. Do you recognize that?

**Detective Piree**: Yes sir, I stand corrected.

**ADA Barry**: Is that one of the activity sheets that's prepared by you and Detective Boyle in your investigation?

**Detective Piree**: Yes, sir.

**ADA Barry**: Does that indicate whether or not a cell phone was recovered from a cell?

**Detective Piree**: That's correct.

*Id.* at 121.[18] With this testimony placing a cell phone in Glass' possession, the Commonwealth introduced records for the phone number associated with that cell phone, establishing that on the day of Victim's murder, 118 phone calls were made or received on that phone. *Id.* As stated above, Thomas argues that the Commonwealth used this

---

[18] The location of the activity sheet that was marked as C-73 is unknown. Thomas sought the activity sheet in the PCRA discovery proceedings. *See* N.T., 10/7/2016, at 76-77; N.T., 7/8/2016, at 21. Despite efforts by both the Commonwealth and the PCRA court to locate the activity sheet, it was not found and is not part of the record. *See* PCRA Court Opinion, 5/31/2023, at 46;

list of phone calls to create a connection between Thomas and the murder. Thomas' Brief at 90.

During the PCRA hearings, Thomas called a designee from the prison who testified that there was no record of a report from Detective Piree about a cell phone in Glass' possession and no records indicating that a cell phone was recovered from Glass' cell. *Id.* at 92. Thomas also points to Detective Piree's admission during the PCRA proceedings that no cell phone was recovered from Glass. *Id.* (citing N.T., 7/8/2016, at 12, 21; N.T., 10/7/2016, at 75, 81).[19] Thomas argues that ADA Barry intentionally induced Detective Piree to give false testimony regarding the recovery of a cell phone from Glass' cell. *Id.*[20] He argues that the prosecution's conduct was so egregious as to prohibit retrial and directs our attention to another case involving ADA Barry, *Commonwealth v. Johnson*, 231 A.3d 807 (Pa. 2020), that occurred within months of Thomas' trial. Thomas points out that in that case, "[t]he Court found … that ADA Barry … made 'almost unimaginable' mistakes, which 'dovetailed' with other serious errors by law enforcement officers and other police personnel." Thomas' Brief at 108. Critically for his purposes, Thomas explains that in *Johnson*, ADA Barry's problematic conduct was deemed to be inadvertent but this Court nonetheless found that it rose to a level that barred retrial, reasoning that the Commonwealth's "deliberate indifference to the preparation and presentation of the … case, which resulted in misrepresentation of physical evidence[,] was designed to deprive Johnson of a fair trial." *Id.* at 112 (internal quotation omitted). It is Thomas' position that ADA Barry admitted to similar deliberate indifference in the

---

[19] This is a misrepresentation of Detective Piree's testimony. He testified that he was not aware of a cell phone being recovered from Glass' cell. N.T., 10/072016, at 75; 7/8/2016, at 21.

[20] Thomas does not argue that ADA Barry fabricated the activity sheet. His argument is limited to ADA Barry's use of the activity sheet.

preparation of Thomas' case and therefore that the same result should follow. *Id.* at 110, 112.[21]

The Commonwealth concedes that the testimony ADA Barry elicited from Detective Piree was later contradicted by both Detective Piree and his partner, Detective Boyle, but argues that the introduction of this "incorrect evidence" does not warrant relief for two reasons. Commonwealth's Brief at 26. First, the Commonwealth emphasizes that while this evidence connected Glass to the murder, it did not inculpate Thomas. *Id.* at 26. The Commonwealth also points out that at trial, it did not seek to link Thomas to any phone number that appeared on the list of calls. The Commonwealth argues that "although the Commonwealth introduced a clearly erroneous statement indicating that the authorities recovered a phone from Glass … used to make 118 calls on the day of the murder, none of that evidence identified [Thomas] as the murderer, or even as the recipient of any of those calls." *Id.* at 27. Second, the Commonwealth reiterates that the testimony about the 118 calls was a minor aspect of its case, as the Commonwealth relied primarily on eyewitness identifications, Thomas' own statement to the police and Taylor's statement to the police. *Id.* at 27-28. At trial, the Commonwealth reminds us, ADA Barry

---

[21] In connection with this claim, Thomas dedicates multiple pages to detailing cases in which Detective Piree was found to be involved in the malicious prosecution of defendants and contends that the PCRA court should have taken these cases into consideration when assessing Detective Piree's credibility. Thomas' Brief at 91-95. Detective Piree's credibility is not relevant to this claim, which is based on ADA Barry's conduct. Thomas devotes nearly as many pages alleging that ADA Barry's misconduct extends to hiding the true source of the phone number of Glass' cell phone, an informant named Eddie Almodovar. *Id.* at 95-98. The evidence to which Thomas points to prove this allegation is testimony to the effect that Almodovar used Glass' cell phone to call a police officer, thereby giving the police the phone number for Glass' cell phone, all of which comes from proceedings in the Glass murder trial and discovery hearings related to this PCRA petition, which occurred after Thomas' conviction. Furthermore, at the PCRA hearing, ADA Barry testified that he did not know about Almodovar's involvement in obtaining Glass' phone number for the police just before the PCRA hearing. N.T., 1/27/2017. Thus, the record does not support this accusation of prosecutorial misconduct.

did not mention the 118 calls after Detective Piree's testimony. *Id.* at 28, 32-33. The Commonwealth argues that despite extensive evidentiary hearings, Thomas has been unable to support his allegation of misconduct in connection with Detective Piree's testimony. *Id.* at 33.

Addressing this claim, the PCRA court explained that prosecutorial misconduct sufficient to invoke double jeopardy protections includes not only intentional misconduct that deprives a defendant of a fair trial, but also reckless misconduct, i.e., misconduct committed with a conscious disregard for the substantial risk that a defendant will be deprived of a fair trial. PCRA Court Opinion, 5/31/2023, at 47-48. Applying that standard, the PCRA court found that the evidence does not support Thomas' claim that a phone was never recovered from Glass' cell, pointing to the testimony of a records custodian for the prison that it is possible that a report could have been made, and a search could have occurred, without being documented. *Id.* at 49 (citing N.T., 10/7/2016, at 20-21). This witness also testified to multiple infractions Glass incurred for possessing cell phones while incarcerated. *Id.* (citing N.T., 10/7/2016, at 23-25). Thus, the PCRA court seems to have determined that Thomas did not conclusively prove that the statement was false. The PCRA court also credited ADA Barry's testimony at the PCRA hearing that the phone records, not the phone itself, were relevant to his case, and that the records were only relevant to connect Glass to the murder. *Id.* at 50-51 (quoting N.T., 1/27/2017, at 29, 55-56). The PCRA court thus concluded that Thomas failed to prove that ADA Barry's conduct constituted misconduct "intentionally undertaken to prejudice Thomas such that he did not receive a fair trial." *Id.* at 51.

This statement by the PCRA court suggests that it evaluated Thomas' claim of prosecutorial misconduct for intentional misconduct only. This is problematic. As it

acknowledged at the beginning of its discussion, under Article I, Section 10 of this Commonwealth's Constitution,

> prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result. This, of course, is in addition to the behavior … specifically designed to provoke a mistrial or deny the defendant a fair trial.

*Johnson*, 231 A.3d at 826. In *Johnson*, the Commonwealth's key piece of evidence incriminating the defendant in the murder of the victim was a red baseball cap. The Commonwealth proceeded through trial under the mistaken belief that the DNA of both the defendant and the victim was found on the red baseball cap. The Commonwealth, represented by ADA Barry, built his case substantially around these DNA results and emphasized the DNA results in his opening and closing arguments. *Id.* at 812-13. In post-conviction proceedings following his conviction of first-degree murder, the defendant unearthed information revealing that there were, in fact, two hats collected in connection with the victim's death – a red cap and a black cap. We explained that the Commonwealth

> misunderstood its own evidence and conflated the findings related to the red and black caps. Although separate property receipt numbers had been assigned to the two hats, this did not prompt the Commonwealth to investigate whether its trial witnesses were discussing two distinct caps – or, alternatively, why a single red cap was associated with multiple property receipts. Even the Commonwealth's forensic scientists who authored, or supervised generation of, the scientific reports did not realize at trial that there were two caps involved.

*Id.* at 814. While the Commonwealth agreed that its conduct entitled the defendant to a new trial, this Court agreed with the defendant that he was entitled to Article I, Section 10's protections:

Although the record, as discussed, supports the common pleas court's ultimate finding that these acts and omissions were not made intentionally or with a specific purpose to deprive Appellant of his rights, the record is likewise consistent with that tribunal's characterization that such mistakes were "unimaginable." Although "unimaginable" is not a traditional mens rea descriptor, it is, together with all of the circumstances on which it was based, strongly suggestive of a reckless disregard for consequences and for the very real possibility of harm stemming from the lack of thoroughness in preparing for a first-degree murder trial. *See generally Johnson*, 2018 WL 3133226, at *1 (expressing that the Commonwealth acted with "deliberate indifference" during its preparation for trial). There is little dispute that those consequences include "prejudice [to] the defendant to the point of the denial of a fair trial." *Smith*, [] 615 A.2d at 325. That being the case, Article I, Section 10 immunizes Appellant from being put in jeopardy a second time for the crimes with which he was charged in connection with the killing of Walter Smith.

*Id.* at 827-28. Thomas argues that while he believes that the Commonwealth's conduct in his case "was in fact intentional, there is no question that at the very least, [it] was reckless." Thomas' Brief at 106.

Despite its application of an incomplete analysis, we agree with the PCRA court's conclusion that Thomas falls short of establishing his claim. The facts, as found by the PCRA court and supported by the record, establish that ADA Barry accepted what was reflected on the activity sheet, the authenticity of which Thomas does not challenge. N.T., 1/10/2020, at 91-92. ADA Barry testified that due to his prior review of the activity sheet, he thought that Detective Piree's initial testimony was mistaken, which is why he sought to refresh his recollection with the activity sheet. N.T., 1/27/2017, at 47. ADA Barry has maintained that the 118 calls were a "minor part of the case[,]" and whether a phone was recovered was even less significant. *See id.*; N.T., 1/10/2020, at 173. This testimony precludes a finding that ADA Barry intended to submit false evidence.

It also falls short of the reckless standard established in *Johnson*. Most significantly, evidence of whether a phone was found in Glass' cell was virtually inconsequential to the Commonwealth's case. As ADA Barry testified, his case was built primarily on eyewitness identifications, Thomas' statement to the police, and Taylor's statement to the police. After Detective Piree's testimony, ADA Barry did not mention the cell phone or the 118 phone calls again. Even if we were to accept Thomas' position that ADA Barry recklessly caused Detective Piree to testify that a cell phone was recovered from Glass' cell, the question necessarily arises as to the effect of that recklessness. Unlike in *Johnson*, Thomas cannot establish that the introduction of this very limited testimony, for a very limited purpose, deprived him or threatened to deprive him of his right to a fair trial. As ADA Barry testified, evidence of the 118 phone calls was intended to link Glass to the murder, not to link Thomas to Glass. N.T., 1/10/2020, at 75-76, 143, 173. It was a minor point in a trial that spanned more than a week. While what occurred here does not reflect acceptable trial preparation practices, it does not compare to the "unimaginable" mistakes and circumstances that coalesced to the egregious recklessness that effectively deprived the defendant of a fair trial in *Johnson*.[22]

---

[22] The record also supports the PCRA court's conclusion that Thomas failed to prove the factual predicate for his claim; i.e., that Detective Piree's testimony at trial was false. Under questioning in PCRA proceedings, Detective Piree testified that when Thomas admitted that he gave a cell phone to a corrections officer to smuggle into prison for Glass, Detective Piree contacted Internal Affairs of the Philadelphia Prison System so that it could investigate the corrections officer. N.T., 10/7/ 2106, at 64-68. The records custodian for the prison testified that if Internal Affairs requested or conducted a search of a prisoner's cell, it is possible that there would be no documentation in the prison's records. *Id.* at 20-21. When asked about the exchange at trial with ADA Barry as forth above, Detective Piree explained that when ADA Barry asked "[d]oes [the activity sheet] indicate whether or not a cell phone was recovered from a cell," his affirmative answer "was about the memo … [he was] not answering as far as what cell phone's recovered or not." *Id.* at 78. He further testified that to his recollection, the activity sheet reflected Internal Affair's response to his report regarding the corrections officer, but he could not recall what it indicated as far as whether a cell phone was recovered. *Id.*

Thomas' second broad claim of prosecutorial misconduct accuses the Commonwealth of withholding information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* imposes upon the Commonwealth an affirmative duty to disclose to the defendant all favorable evidence material to guilt or punishment, even in the absence of a request by the defendant for the same. *Commonwealth v. Bagnall*, 235 A.3d 1075, 1085 (Pa. 2020). A defendant must prove the following to establish a *Brady* violation: first, that the evidence at issue was favorable to the defendant; second, that the prosecution suppressed the evidence, either willfully or inadvertently and finally, that the evidence was material. *Id.* at 1086. Evidence is considered to be favorable to a defendant when it is proven that if disclosed and used effectively, it may make the difference between conviction and acquittal. *Commonwealth v. Chambers*, 807 A.2d 872, 888 (Pa. 2002). Evidence is material for *Brady* purposes when its absence caused prejudice. *Id.* This is a high bar, as "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality" in the *Brady* context. *Id.* at 887.

Thomas argues that the Commonwealth withheld information that Wanted had a motive to kill Victim in retaliation for being robbed by someone associated with the Gaymons. Thomas' Brief at 81-82. Thomas bases this claim on a finding, made during the course of Glass' murder prosecution, that prior to Tyreek's murder, Glass and "a friend" approached Tyreek and Victim and accused them of knowing who robbed the unidentified friend. *Id.* at 81. Thomas "believes and avers" that the friend who was robbed was Wanted, and therefore asserts that the Commonwealth was required to disclose evidence related to Wanted's robbery. *Id.*

The allegedly suppressed information upon which Thomas makes this claim came to light during Glass' trial, which occurred more than a year after the conclusion of

Thomas' trial. *Id.* at 81-82 (citing N.T., 10/6/2008, at 46-47). Thomas ignores this temporal complication. At no point does Thomas allege, much less prove, that the Commonwealth possessed information related to Wanted's robbery prior to, or during, his trial.[23] We conclude, as did the PCRA court, that Thomas failed to prove that the Commonwealth suppressed the evidence upon which his claim is based. *See* PCRA Court Order, 5/31/2023, at 32.

Thomas also alleges that the Commonwealth committed a *Brady* violation when ADA Barry failed to provide the defense with a CD of recorded prison phone calls made by Glass for a period of time "just prior to and after" Victim's murder. Thomas' Brief at 131. He points out that in the recordings Glass does not mention Thomas, seeming to suggest that the absence of his mention makes the CD both favorable to him and material so as to bring it within bounds of a *Brady* claim. *Id.* Thomas also contends that by comparing the dates and times of the calls recorded on the CD with the T-Mobile records of the 118 cell phone calls reveals that Glass was on the prison phone at the same time calls were made from the cell phone. Had the CD been turned over to the defense, Thomas argues, he could have refuted the Commonwealth's claim that Glass was the only person to use the cell phone in question. *Id.* at 132.

As the Commonwealth points out, the PCRA court found that the evidence does not support this claim. The PCRA court credited ADA Barry's testimony that it was his best recollection that he obtained the CD after Thomas' trial ended in preparation for Glass' trial, and that if he had the CD prior to Thomas' trial he would have disclosed any *Brady* material to Trial Counsel. PCRA Court Opinion, 5/31/2023, at 31; Commonwealth's Brief at 37-38. Because Thomas did not prove that the Commonwealth possessed the

---

[23] Moreover, at no point does Thomas prove that Wanted was robbed, which is the foundation for his claim that Wanted had a motive to kill Victim and therefore, that the Commonwealth had a duty to disclose information related thereto.

CD at the relevant time, the PCRA court concluded that the claim must be dismissed. PCRA Court Opinion, 5/31/2023, at 31.

The record supports this determination. Thomas asked ADA Barry whether he recalled telling the judge that presided over Thomas' trial, Judge Poserina, that he had listened to the CD in his possession and that its contents did not implicate *Brady*. N.T., 1/27/2017, at 37. ADA Barry responded that he did not recall, but allowed that if that is what the transcript reflected, that he could not dispute it. *Id.* However, it became clear shortly thereafter that Thomas' counsel misspoke, as she was referring to a transcript from Glass' trial, over which Judge Sarmina presided. *Id.* at 38. At that point, ADA Barry clarified that his answer was given in response to Thomas' counsel's representation that the transcript was from a proceeding before Judge Poserina. *Id.* at 40. He explained that it was his belief that he obtained the phone calls after Thomas' trial, in preparation for Glass' trial. *Id.* at 40-41. Moreover, Thomas only became aware of this evidence because of ADA Barry's statement to Judge Sarmina in the Glass case. *Id.* at 38. Thus, while Thomas established that the Commonwealth possessed this CD at the time of Glass' trial, which commenced more than a year after Thomas' trial concluded, Thomas failed to establish that the Commonwealth knew of or was in possession of the CD at the time of his trial. Thus, he did not prove the Commonwealth's intentional or inadvertent suppression of the CD, and so the claim fails. *Chambers*, 807 A.2d at 887-88.

### Abuse of Federal Process to Obtain Evidence

Thomas alleges that the manner in which the investigating detectives obtained the list of the 118 calls made violated his rights under Article I, Section 9 of the Pennsylvania Constitution and the Sixth and Fourteenth Amendments of the federal Constitution. Thomas' Brief at 112. Despite the gravity of this allegation, Thomas provides only the faintest sketch of a claim. In the single page dedicated to this issue, Thomas merely sets

forth that at a PCRA hearing, Detective Frank Kerrigan testified that he obtained the list of phone calls through a federal subpoena and cites a federal statute for the proposition that federal subpoenas "are only supposed to be issued in federal drug investigations." *Id.* at 113.[24] He summarily states that it was an abuse of process for the police to obtain evidence through a federal subpoena and that he "believes and avers that it was done in this manner to obfuscate and conceal from the defense where the 118 calls actually came from." *Id.* Thomas does not mention the constitutional provisions he claims were violated or develop an argument in support of his broad conclusions. This Court will not develop an argument on an appellant's behalf. *Commonwealth v. Armolt*, 294 A.3d 364, 377 (Pa. 2023). In the absence of any semblance of advocacy, we find that this claim is so underdeveloped as to preclude our review.

## Conclusion

Having reviewed Thomas' claims of error, we find no abuse of discretion in the PCRA court's rulings and subsequent dismissal of Thomas' PCRA petition. Accordingly, we affirm.

Chief Justice Todd and Justices Dougherty, Wecht, Mundy, Brobson and McCaffery join the opinion.

---

[24] Thomas' citation to notes of testimony for this statement that he attributes to Detective Kerrigan is inaccurate. The citation he provides corresponds to testimony from ADA Barry that when Detective Kerrigan obtained phone records, he did so "as a Philadelphia police officer and not as someone involved in federal law enforcement." N.T., 1/17/2017, at 52.